Wheeler, D. J.
This bill is brought upon letters patent Bfo. 122,001, dated December 19, 1871, issued to J. Joseph Eagleton, Sarah N. Eagleton, administratrix, assignor to Eagleton Manufacturing Company, for an improvement in japanned furniture springs. The defences set up in the answer are that Eagleton was not the original and first inventor of the improvement; that the specification is not sufficiently full, clear and exact to enable persons skilled in the art to practice the. invention; that the specification does not contain the whole truth relating to the invention; and that the defendants do not infringe.
The springs, which are the subject of the patent, are coiled helical or hour-glass springs, so-called, made of steel wire, *775 for furniture seats and beds. It is desirable that such springs should be protected from corrosion, and that they should be strong and elastic. The patent is for springs protected by japan, and tempered by the heat used in baking on the japan. It specifies no degrees of heat to be used, except that it is to be sufficient to bake and harden the japan. The evidence shows clearly that in coiling the wire of which these springs are made into the shape required, it is weakened by the strain on the outside and the compression on the inner portions, and that its strength and elasticity are restored and improved by subjecting them to heat, which need not be great enough to make them limber and to lose their shape, as would be necessary in tempering by the old process; that the best result is produced by heat at about 500 degrees, and that japan may be baked on them by heat at from 200 to 700 degrees, with the facility and rapidity sufficient for manufacturing establishments, and at still lower heats by taking longer time for the operation.
The oath of Eagleton that he believed himself to be the original and first inventor of the improvement described in his application was made June 26,1868. He authorized the members of the firm of Munn & Co. to act as his attorneys in presenting the application^ and making all such alterations and amendments as might be required, and his application was filed July 6, 1868. It was rejected, and he was notified by letter, in the care of his attorneys, dated July 10, 1868, of the rejection. He died in February, 1870. The application was renewed as in his name, by the attorneys, December 29, 1870. The specification was amended by them, in his name, October 19, 1871, and again rejected; was amended in like manner November 7, 1871, and was finally granted.
That steel furniture springs of this sort, tempered and strengthened in this manner, were known and used by various persons named in the answer, before the date of the patent, is fully and clearly shown by the evidence and not disputed. If the patent was not accompanied by the application the date of the patent would be deemed to be the date of the invention, *776 and that evidence would defeat the patent, without further proof of still prior invention by Eagleton. Kelleher v. Darling, 14 Off. Gaz. 673. And the application, when produced, in order to be effective evidence to carry the date of the invention back to its own date, must be an application for substantially the same invention for which the patent is granted, without material variation or addition. Railway Co. v. Sayles, 97 U. S. 554. The date of the application alone would not be sufficient for that purpose. In this view the original application of Eagleton is important. After the preliminary statement that he has made an invention, and referring to the following as a description, and to the drawing, stating that it “represents a furniture spring, provided, according to my im. provement, with a japan covering,” he proceeded: “The nature of this invention relates to improvements in helical furniture springs, such as are used for mattresses, sofas, etc., the object of which is to provide steel springs which will not be so liable to injury from corrosion as those now in use. It consists in providing steel springs, such as are commonly used, with a japan outer covering. Steel springs, as is well known, possess in a much higher degree the requisite qualities of strength, flexibility and elasticity than iron, copper or brass, and by reason of the susceptibility of steel to be tempered and thereby regulated to any degree of elasticity, it is much more preferable to use; but, owing to its great liability to deterioration from corrosion, it is but little used for such springs.
“To obviate this difficulty I propose to provide steel springs coated with japan, which I find to be of great advantage in resisting the corrosive action of the atmosphere on the steel, and whereby steel springs are made very much more durable than any other. To some extent the same purpose may be accomplished by coating the spring with tin or zinc, or other similar metal which will not suffer by corrosion, but the process of coating with such metal requires the use of acids for cleaning and preparing the steel, which, adhering to the steel, and being to some extent enclosed within the said coating and maintained in contact with the steel, have an injurious *777 effect thereon. I have, therefore, found that when the springs are protected by japanning they are much more durable and give more satisfactory results, the same being applied by the common japanning process.
“ Having thus described my invention, I claim as new, and desire to secure by letters patent, japanned furniture springs, as a new article of manufacture, substantially as and for the purpose described.”
Here is the whole of the specification and claim, and there is nothing in it nearly or remotely suggesting or hinting at anything more than merely protecting the springs by japan.
There is not a word about any method of tempering them whatever; nor that his treatment of them has any tendency whatever to temper them.
All that is said relates entirely to their need of protection, and to his mode of protecting them. The patent office so understood and construed it, rejected it because japanning was open to all, and informed him of the rejection and its grounds, and he acquiesced in it as long as he lived. There is no question but that the rejection upon that understanding was right. It is not claimed that this patent, or any patent, could be maintained for merely protecting steel or any other metal, in the form of these springs, or in any other form, by japan.
The discovery is that moderate heat, such as may be applied in japanning, will restore and impart temper to these springs.
The patent is, therefore, for the springs tempered in this manner.
The application does not take that discovery or invention back to its date at all. It shows nothing affirmatively about any such thing. Still, it is claimed that the proofs in the case show that Eagleton was in fact the first inventor or discoverer of this improvement. When the application fails to take the date of the invention back of the date of the patent, and the defendants make out prior knowledge and use by others beyond any fair or reasonable doubt, as the law re *778 quires, the burden is shifted on to the plaintiff to show invention or discovery by the patentee still prior to that.
The evidence on which the plaintiff claims to make this out is weak; not so much in the number and character of the witnesses, as in what they pretend and appear to know that Eagleton discovered and did. . They fail to set forth such experiments and tests, and results examined by him, as would ordinarily accompany such a discovery. On this subject his original application is very weighty and important. As said by Mr. Justice Nelson in Manny v. Jagger, 1 Blatchf. 372: “ The description of the invention by the patentee, in his own language, affords the highest evidence of the thing or instrument which he claims to have discovered.”
In view of all the evidence on this subject, it not only does not appear that Eagleton did make this invention or discovery before the others, but it appears that he did not, and that probably it never came to his knowledge while he lived.
It is said in argument that it is not necessary he should have known the full effect of the process he invented in order to uphold the patent, and that if he invented japanning it might not be necessary for him to know that japanning would temper. It is doubtless true that an inventor need not know all the uses to which his invention is capable of being put; and equally true that there must be some patentable invention patented before any use of it can be covered by the patent. Here, japanning by itself was not patentable. Eagleton described no mode of japanning which would temper or strengthen the steel. The temper and strength are produced by the heat altogether, and not at all by the japan. He did not even mention that the japan was to be applied with heat. Had a patent been granted to him on his application it would have covered japanned springs, not tempered springs. He did not invent or discover anything patentable of which any one use could be made, and, a fortiori, not anything of which more than one use could be made.
' Upon this view of these questions of fact, the issue of fact joined upon the traverse of the answer must be found for the defendants.
*779 Further, upon these facts, the law, both at the time when the original application was made and at the time of the amendments, required the applicant to make oath that he verily believed that he was the original and first inventor or discoverer of the art, machine, composition or improvement for which he solicited a patent, (Act of 1836, 5 St. at Large, 117, § 6; Rev. St. § 4892;) and that, if the application was by executors or administrators, the oath should be varied so as to be applicable to them. Act of 1836, § 10; Rev. St. § 4896. The invention which Eagleton made application for, and to which his oath was applicable, was japanning steel furniture springs merely. He authorized his attorneys to amend the application. At his death their authority ended. Bac. Abr. Authority, E; Hunt v. Rousmaniere, 8 Wheat. 174.
They made the amendments in his name without any authority in fact, whatever authority they may have supposed they had. The amendments were not mere amplifications of what had been in the application before, but carried into it the pith and substance of the whole invention for which the patent was granted. The patent was granted upon this without any new oath by the administratrix. Probably a patent may well be taken out by an administrator upon the application and oath of the intestate to that invention for which the patent issues; but that is not this case — this invention is entirely different.
This application, as to the invention for which the patent issued, was made and acted upon as upon the application and oath of a living person, when there was no such person and could not be any such application and oath.
The proceedings of the patent office are presumed to be regular, and founded upon proper proceedings, but they must necessarily be founded upon the applications of living persons or their personal representatives, such as the law recognizes, and not upon those of persons who are merely supposed to exist; and should be founded upon the oath of the inventor or his personal representative, in accordance *780 •with the statute. In this case the substantial part of the thing patented was imported into the application of a person not in existence, in his name, without the support of the oath required by the statute from either him or his personal representative, or anything but the act of those who had been his attorneys, but who could not be such, for he could have no attorney, then. In Railway Co. v. Sayles, 97 U. S. 554, before cited, Mr. Justice Bradley says: “It will be observed that we have given particular attention to the original application, drawings and models filed in the patent office by Thompson and Batchelder. We have deemed it proper to do this, because, if the amended application and model filed by Tanner five years later embodied any material addition to or variance from the original, — anything new that was not comprised in that, — such addition or variance cannot be sustained on the original application. The law does not permit such enlargements of an original specification, which would interfere with other inventors who have entered the field in the meantime, any more than it does in the case of re-issues of patents previously granted. Courts should regard with jealousy and disfavor any attempts to enlarge the scope of an application once filed, or of a patent once granted, the effect of which would be to enable the patentee to appropriate other inventions made prior to such alteration, or to appropriate that which has in the meantime gone into public use.”
This case is stronger against the patent than that there spoken of. Here the addition was made wholly without authority in fact, while there, apparently, it had the support of the inventors themselves all the way through.
This objection is not specifically set up in the answer, and it is claimed that for that reason it cannot properly be taken notice of. Some defences to suits on patents, like those resting upon prior knowledge and use by others, and those resting upon failure of the specification to disclose the whole truth in respect to the improvement, and others named in the statutes, have to be set out more fully in some cases than the ordinary rules of pleading would require, because the *781 statutes so require, but all defences are not required to be so specifically set forth. Brown v. Piper, 91 U. S. 37; Terhune v. Phillips, 99 U. S. 592.
The defendants deny infringement, and set up the right to make tempered springs, sufficiently to put the plaintiff to proof of the patent alleged in the bill; and that proof may be met by any proof on the part of the defendants, which will tend to show there was no valid patent; and such evidence is admissible under these pleadings unless it goes so far as to attempt to make out a defence which the statute requires to be alleged that is not alleged. This is like evidence under the general issue at law which is always admissible to show that a written instrument declared on never had any valid existence in fact, although it did have in form.
Let there be a decree dismissing the bill of complaint, with costs.