MICHIGAN CENT. R. CO. v. CONSOLIDATED CAR-HEATING CO.

(Circuit Court of Appeals, Sixth Circuit. April 2, 1895.)

No. 250.

1. PATENTS—AMENDMENTS TO APPLICATION.
The right to amend the specifications during the pendency of an application in the patent office is limited to the insertion of additional matter which is within the scope of the original application, and no new matter can properly be introduced. Railway Co. v. Sayles, 97 U. S. 554, followed.

2. SAME—TEST OF NEW MATTER.
In determining whether matter introduced into an application by way of amendment is new matter, it may be that the original drawings are to be understood with such variations in form, shape, and proportions as common sense and mechanical skill in that art would suggest. But this carries the doctrine to its verge, and if the original drawings and specifications fail to indicate to those familiar with the art, and having the mechanical skill peculiar thereto, the device which is introduced by the amendment, then the patent does not include that device.

3. SAME—PRESUMPTION ARISING FROM PATENT.
The presumption arising from the issuance of the patent that the patentee was the original inventor does not apply to a case where, by reason of other inventions and public use prior to the date of his application. it is necessary to prove that his invention antedated them. In such case the burden of proof is upon the party claiming under the patent.

4. SAME—STEAM CAR HEATERS.
The Cody patent (No. 329,017) for improvements in steam car heaters *held* void, as to claim 2, for want of invention.

Appeal from the Circuit Court of the United States for the Eastern District of Michigan.

This is a suit by a bill in equity filed in the court below against the Michigan Central Railroad Company by the appellee, the Consolidated Car-Heating Company, to restrain the infringement by the railroad company of rights secured to Elmore D. Cody, as inventor, and to John W. Hayes, as assignee of a part interest, by letters patent No. 329,017, for improvements in steam

car heaters, granted October 27, 1885, upon an application filed August 11, 1884. The allegations of the bill are, in substance, that Cody was the first inventor of such improvements; that a patent was issued therefor on the 27th day of October, 1885, to him and to Hayes, to whom he had assigned a half interest in said invention; that the entire interest has come, by mesne assignments, to complainant; that the alleged infringement has, since the date of the patent, been carried on by the defendant, in the using, and selling to others to use, car heaters embodying the same principles of construction and operation as those described in the patent; and that the complainant had reason to fear the continued use and selling of such car heaters; whereupon the complainant prays for an injunction, and for an accounting for profits, and damages. The answer admits the issuance of the patent, and at the time stated in the bill, but denies that Cody was the first inventor of the improvements therein mentioned, and alleges that they were fully shown and patented in letters patent No. 201,061, issued to W. Smith March 5, 1875 (car heater); No. 212,375, issued to S. W. Graydon February 18, 1879 (car heater); No. 265,284, issued to D. D. & J. H. Sewall October 3, 1882 (car heater); No. 284,250, issued to N. Slingland September 4, 1883 (car heater); No. 126,343, issued to G. F. Stone April 30, 1872 (car heater). The answer also sets up the prior public use, for more than two years before Cody's application for the patent, by persons and at places enumerated,— among them, by William Martin, at Dunkirk, N. Y.; that defendant uses a system and apparatus for car heating obtained from the Martin Anti-Fire Heater Company, which was patented to the said William Martin October 25, 1887; and that, when Cody made the application for his patent, he knew of the invention by Martin of the device and system covered by Martin's patent. The answer denies the infringement of the Cody patent: A replication to this answer was filed, and proofs were taken.

Three claims are shown in the Cody patent, as follows: (1) A system of piping for heating railway passenger cars, consisting of a supply pipe extending longitudinally under the central portion of a car, communicating with steam drums or coils inclosed in chambers under the floor of such car, in combination with pipes extending from the central portion of said supply pipe to the upper courses of coils of pipe along the sides of such car, and escape pipes from the central portion of the lower courses of said coils, communicating with and draining into a steam trap under the floor of the car, substantially as and for the purpose set forth. (2) In a railway car heater, side coils, H, H, on either side of the car, substantially as shown, in combination with the continuous steam-supply pipe, A, under the body of the car, between the upper courses of the side coils, H, H, and the supply pipe, A, an automatic steam trap, H, under the central portion of the car, and the intermediate connections between the lower courses of the side coils, H, H, and the steam trap, M, substantially as and for the purpose set forth. (3) The combination, in a railway car heater, of a steam-supply pipe, A, extending under the body of the car, from end to end thereof, and communicating near each end of the car with steam drums, B, B, in chambers under the floor of the car, and communicating near the center of the car with the upper courses of both of the side coils, H, H, with an automatic steam trap, M, communicating near the center of the car with the lower courses of both of the side coils, H, H, substantially as and for the purpose set forth. These claims indicate sufficiently for the purposes of the opinion the general form of the structure and system of the patent. It may be added that it contemplated the connecting of the ends of the supply pipe, and taking steam from the locomotive under all the cars in the train. The principal controversy in this suit is founded on the second claim, and the evidence taken by the parties relates largely to the question whether Cody or Martin first invented the system of car heating covered by the complainant's patent. Cody was in the employment of Martin's company, in the business of heating cars by steam, and in perfecting a system of piping adapted to that purpose, at the time when it is claimed for Cody that he made his invention; and the defendant claims that Cody took the invention from Martin, and afterwards patented it. The complainant put in evidence a certified copy of the file wrapper and contents, showing the proceedings

in the patent office pending Cody's application. The nature of those proceedings is stated in the opinion following. The court below decreed for the complainant, and the defendant brings the case here on appeal.

J. C. Sturgeon (J. B. Foraker, of counsel), for appellant.

Parker & Burton, for appellee.

Before TAFT and LURTON, Circuit Judges, and SEVERENS, District Judge.

Having stated the case as above, SEVERENS, District Judge, delivered the opinion of the court.

Prior to Cody's application for a patent, a variety of devices had been contrived for heating cars by steam or hot water in pipes, and some of them had been patented. In some there was shown a heater of water or generator of steam under each car, which circulated the water or steam through side coils in the car, and back to the boiler, or, in case of steam, to a trap. Others took steam from the locomotive, and carried it directly through the body of the cars, either entire, or split into divided currents in each car, where it was circulated at the sides in coils of pipe, with incidental arrangements for trapping the water of condensation. Still others, approaching more nearly the system in Cody's patent, taking steam from the locomotive, carried it by a continuous pipe under the whole train, with joints at the end of each car, and with devices for taking off the steam in whole or in part, for the supply of the cars in the train, according to their number. The steam thus taken off was carried up into the car, and there circulated, with more or less efficiency, in coils of pipe variously arranged along the sides of the car, and, after being condensed, was drained into a trap. William Martin had in the year 1883 contrived a system in its general features like the last described, and was then experimenting with it upon the cars of the Dunkirk, Allegheny Valley & Pittsburgh Railroad Company,—a railroad running out of Dunkirk, N. Y., to Pittsburgh, Pa. This system had not yet been perfected. Difficulties were encountered with it, which the author was endeavoring, by study and experiment, to overcome. One of those difficulties, and probably the principal one, was that of so arranging the pipes as to get a continuous flow of steam through the coils of pipes and the drums, unimpeded by pockets of air and water from the condensing steam which would be formed in the circuit by the change in the horizontal plane of the car and pipes in passing over the changing grades of the road. Some other difficulties were to be overcome, which it is not necessary here to dwell upon. This, as we gather from the proof, was the condition of things, with respect to the Martin system, in the latter part of the year 1883. In November of that year, Cody was employed by the company in which Martin was interested, and of which he was manager, to work for it in fitting and putting into cars their steam-heating apparatus. and remained in that employment until the following March. During that time certain improvements were introduced into the Martin system which resulted in removing the principal difficulties which had been en-

countered, and from that time forward that system has been carried into extensive use in heating passenger cars on railroads. These improvements Cody claims to have invented, and they constitute the basis of his patent. The principal question discussed upon the argument was the one fact of whether Cody invented the improvements, or whether Martin invented them, and Cody was a workman simply constructing the apparatus under Martin's directions. But another question arises and is presented upon the appellant's contention that Cody so changed his specifications during the pendency of his application as to show another invention from that originally described, and give to his combination utility and value, and but for which it would be practically valueless. As has been stated, one of the problems which in 1883 confronted those who were seeking to construct an operative system was to devise an arrangement of the steam pipes such as would provide for the ready escape of air and water, so that they would not obstruct the circulation, and thereby prevent the free flow of steam through the pipes. Cody's application was made on the 11th day of August, 1884, and the patent issued to him and Hayes, as assignee, on the 27th day of October, 1885. In his specifications he said nothing about inclining the members of the side coils of his steam pipes, H, H, downward from the center of the car, where steam is taken in, to the end of the car, and also inclining downward the return pipes as they come back to the center and connect with the pipe which carries their contents downward to the trap. And the drawings filed with the specifications, and which, by the provisions of section 4884 of the Revised Statutes, become part thereof, not only fail to show any such inclination, but, on the contrary, show the out-running and returning pipes to be parallel with the floor of the car and with each other. Neither of his claims mentioned any inclination of these pipes. If the specifications had done so, that feature could have been read into the claims, for the claims refer to the specifications, which, as we have already said, include the drawings. But as the specifications give no indication of such feature of construction, but do indicate parallel pipes, the claims must be construed accordingly. Claim 2, as the claims now stand, was originally claim 1, and was rejected at the patent office upon a reference to a patent to Slingland of September 4, 1883, which showed a steam supply extending up through the floor of the car, and connecting with the middle of the upper member of a coil of pipes extending from the middle of the ends of the car, and returning thence to the center, and descending to the bottom of the steam generator, whereby the condensed steam was taken into the generator. On February 7, 1885, Cody's specifications and claims were amended, and the substance of original claim 1 was made claim 2, but nothing was said about inclining the pipes. Claim 2, as it then stood, was again rejected on other references showing certain means for discharging the water of condensation. On the 9th day of March, following, Cody radically amended his specifications in respect to this subject, saying:

"Second. I supply hot steam to the upper courses of coils in the car, at or near the center, longitudinally, on both sides of the car, this steam traveling both ways to the end of the car, in pipes inclined downward toward the ends of the car, and on its return it travels from the ends of the car, in the lower courses of the pipes which incline downward to the center of the car, where they connect with a common waste pipe."

This was but a short time prior to the application of Martin showing a device of similar character to that contained in Cody's amendment, Martin's application having been filed March 30, 1885, and the proof unquestionably shows that the device had been in use a year or two prior to either application. There is no suggestion in the bill that Cody's invention had been made prior to his application, and, upon the face of it, the presumption would be that the invention was contemporaneous with the application. The claim was afterwards further amended, upon objections to its form, so as to stand as it appears in the patent. By the rule of construction to which we have already referred, this second claim, by reference to the specifications as they now stand, is for the invention of a combination which includes, as an element, side coils constructed so as to dip from the center of the car to the ends, and back to the center, whereby effectual drainage and a free flow of steam are secured.

By section 4892 of the Revised Statutes the applicant is required to make oath that he believes himself to be the original inventor of the improvement for which he solicits a patent. Cody made such oath on making his original application, but did not make oath in respect to the matter brought in by the amendment. No doubt, it is competent to amend the specifications while the application is pending, so long as it is done within the scope of the original application; but it is not competent, under color of this privilege, to introduce new matter. Systems of car heating in use at the time of Cody's alleged invention, such as Sewall's and Martin's, showed substantially the same combinations as his, except that they did not contain this characteristic element. It is true, some of the parts of those systems were susceptible of mechanical improvement,—such, for instance, as the substitution of a better kind of trap for discharging the condensed water, but which involved no change in the principle of the combination. We are therefore to inquire whether the matter of the amendment in this case was new. As we have said, this peculiarity of construction did not appear in any part of the application originally. It is admitted by the appellee that it is an essential feature of the patent. It is said by its counsel, in his brief:

"Another element in the problem was caused by the fact that cars seldom stood upon level tracks when cut out from the train, and very frequently were on inclines during the running of the train. In order to meet this condition, it became necessary to permit steam to enter at the highest point in the car system, from the train pipe, and to give it sufficient decline, and trapping it at the lowest point, so as to permit, at all times, all of the water to run out at the trap, and not to accumulate in the pipes at the lower end of the car, or upon the lower side. An incline of only a couple of inches would be sufficient, but would not show in a patent-office drawing, unless greatly proportionally exaggerated."

It may be observed, in passing, that the difficulty incidentally suggested in this last sentence has no foundation. The combination could have been described in the written specifications, and the imperfection of the drawings thus helped out. Besides, the drawings in other patents before us demonstrate that there was no insuperable difficulty in so making them as to show this peculiarity. The experts for the appellee lay stress upon this feature, and Cody himself testifies that without it his system would not be a successful and operative one, and he says:

"The reason is that a pipe that is perfectly level, running from end to end of the car, wouldn't work when one end of the car was lower than the other is. It would form a trap at the lower end of the car, and the condensed steam would not circulate."

The leading case upon this subject is that of Railway Co. v. Sayles, 97 U. S. 554. That case involved the validity of Tanner's patent for a brake to apply to double trucks under railroad cars. Prior to the patent, and prior to the application therefor, various devices for the same purpose had been patented, but the desideratum was a system which could be operated from one end of the car. The original application for the Tanner patent did not show an invention which accomplished this, but an amendment made some years later showed such a device. It was held that the patent must be limited to the structure shown by the application. And it was said by Mr. Justice Bradley, delivering the opinion of the court, that, if the amended application and model embodied any material addition to or variance from the original,—anything that was not comprised in that,—such addition or variance could not be sustained on the original application:

"The law does not permit such enlargements of an original specification, which would interfere with other inventors who have entered the field in the meantime, any more than it does in the case of reissues of patents previously granted. Courts should regard with jealousy and disfavor any attempts to enlarge the scope of an application once filed, or of a patent once granted, the effect of which would be to enable the patentee to appropriate other inventions made prior to such alteration, or to appropriate that which has in the meantime gone into public use."

In that case five years elapsed after the application was filed before the amendment was made. In this case a much less period intervened, but the length of time is not a controlling consideration, as is shown in the cases hereafter to be referred to.

It will be seen from the opinion in Railway Co. v. Sayles that the objection to new matter brought in by amendment of the specifications stands upon the same ground as when it is introduced upon a reissue, and in respect to the latter the statute declares that it shall not be done. Rev. St. § 4916.

Following that case was that of Eagleton Manuf'g Co. v. West, Bradley & Cary Manuf'g Co., in which there was an opinion at the circuit by Judge Wheeler, which is reported in 2 Fed. 774. The substance of his opinion was adopted by the supreme court in the same case (111 U. S. 490, 4 Sup. Ct. 593), and the judgment affirmed. In that case the application for the patent sued on was made in July, 1868. The applicant died in February, 1870. The specifi-

cations were amended in November, 1871, by the attorneys whom the patentee appointed in his lifetime, but without any new oath by his administrators, and the patent finally granted. Originally the application was for a patent on japanned furniture springs. Nothing was suggested in it about tempering the springs by the process of applying heat in japanning. By the amendment that mode of effecting the result was described. The claim was for the japanned springs, as a new article of manufacture, substantially as used for the purpose described. The original application was rejected because japanning was not new. Upon the amendment showing the new matter, whereby the springs were tempered in the japanning process described, the patent was granted. It was held, among other things, that, as the amendment introduced new matter, it should have been sworn to, in that case, by the administrators; that the only invention to which the application and oath of the patentee were referable was that of merely japanning steel furniture springs; that the amendment was not a mere amplification of what had been in the patent before; and that the patent was void.

In the very carefully considered case of Brush Electric Co. v. Julien Electric Co., 41 Fed. 679, was introduced a patent for a secondary battery element or electrode consisting of a plate constructed of materials therein described, and having grooves, receptacles, or perforations therein. When the application was originally filed, neither the specifications, drawings, nor claims mentioned "perforations" extending through the plate. Nearly a year afterwards they were amended by the insertion of that term. Judge Coxe, in discussing the effect of this, said:

"The common meaning of 'perforation' is a hole or aperture passing through a body. It is argued that the patentee intended this meaning should be adopted, for he says, 'Fig. 8 shows a vertical section of a ribbed plate provided with slots or perforations extending through the plate.' And yet other parts of the specifications would indicate that he intended no distinction between perforations and receptacles. As before stated, the language quoted first appeared a year after the original application was filed. The court has grave doubt, therefore, whether these facts do not bring the case within the rule laid down in Railway Co. v. Sayles, 97 U. S. 563; Kittle v. Hall, 29 Fed. 508, and cases there cited."

Then, after pointing out that the words found in context with it meant cavities or cells, and that this was a sense in which the word "perforations" was sometimes used, he concludes:

"With considerable hesitation, I shall hold that these claims, as thus construed, are valid."

The question was again presented in Refrigerating Mâch. Co. v. Featherstone, 49 Fed. 916; Id., 147 U. S. 209, 13 Sup. Ct. 283. There the applicant for a patent filed his application on the 24th day of November, 1875, and three days afterwards died. The attorneys whom he had appointed amended the specifications in December following, and the patent was granted on March 21, 1876. Just what the amendment was does not appear; and Judge Blodgett, while expressing great doubt whether the changes made in the specifications did not vitiate the whole proceedings, and

render the patent void, yet placed his decision upon another ground. Upon an appeal from a decree dismissing the bill, the circuit court of appeals certified several questions to the supreme court for decision, among which was one which requested the opinion of. that court as to whether the amendment of the specifications rendered the patent void. The certificate stated that it was "within the scope of the original oath and the invention described in said original specification, and by way of limitation of the claims." The supreme court, responding to this question in an opinion by Mr. Chief Justice Fuller, after reciting the certificate as above, said:

"In Eagleton Manuf'g Co. v. West, Bradley & Cary Manuf'g Co., 111 U. S. 490, 498, 4 Sup. Ct. 593, before referred to, the patent was held invalid. because the authority given to Eagleton's attorneys ended at his death, and the patent was granted upon amendments made by the attorneys without any new oath by the administratrix. And Mr. Justice Blatchford, speaking for the court, said that the file wrapper showed, 'beyond doubt, that there was no suggestion, in the specification signed and sworn to by Eagleton, of the invention described in the amendment,' and that 'in view of the entire change in the specification, as to the invention described, the patent, to be valid, should have been granted on an application made and sworn to by the administratrix. The specification, as issued, bears the signature of Eagleton, and not of the administratrix; and it is sufficiently shown that the patent was granted on the application and oath of Eagleton, and for an invention which he never made.' In the case at bar there was not only no amplification of the original application by the amendment, but it was within the scope of the original specification, and a limitation and narrowing of the original claim, so that it was the identical invention sworn to by Boyle; and there was no more reason for requiring a new oath from his administratrix than there would have been for requiring it from Boyle himself."

And it was held that the amendment did not render the patent void. From this, it would seem to be the opinion of that court that the statute requiring an oath to an amendment by administrators, etc., does not apply to an amendment which would not require a new oath from the original applicant, if he were still living, and taken in connection with Eagleton Manuf'g Co. v. West, Bradley & Cary Manuf'g Co., above referred to, would seem to indicate the test to be whether the amendment is within the scope of the. original application, or introduces new matter. As was said by Judge Woods in delivering the opinion of the circuit court of appeals in Western Electric Co. v. Sperry Electric Co., 7 C. C. A. 164, 58 Fed. 186, 196:

"So long as he [the inventor] did not change the structure of his device or his invention, he had the right to change the specifications.".

Robinson on Patents states the law thus:

"Amendments in substance can be made only within certain limits, and under certain prescribed conditions. No new matter can, under any circumstances, be introduced by amendment. New matter is that which is not found in the specification, drawings, or model, as first filed, and which involves a departure from the original invention. Such matter must necessarily be a distinct art or instrument, or a new and separately patentable improvement on the old, and can be now presented only in a separate application. The scope of the amending power is limited to such alterations of description and assertion as do not affect the essential character of the invention or the person of the patentee. For a mistake in these the only

remedy is by the issue of a new, original patent, upon an independent application." Sections 561, 635.

Counsel for the appellee, in discussing this subject, and excusing the insufficiency of the drawings to show this feature of the patented device, urges that they do not prevent "such variations in an apparatus, in form, shape, and proportions, as common sense or mechanical skill in that art would suggest. Rather, they are addressed to persons skilled in the art, who can supplement them with their technical knowledge." Admitting this to be so, and to be applicable to the written specifications also, still it carries the doctrine to its verge; and, if the drawings and specifications fail to indicate the device to those conversant with the art and having the mechanical skill peculiar thereto, they are insufficient, and the patent does not include the device. Applying this as a further test, and bearing in mind what has already been said by us, and claimed by the counsel for the appellee, in respect to the problem of getting rid of pockets of air and the water of condensation, the conclusion is inevitable that the taking into the combination of the element of coils of pipe so arranged as to get rid of the difficulty was something new. Would it naturally occur to one possessing merely mechanical skill to arrange the coils in the effective way shown in the patent? If so, then there was nothing new, in the nature of invention, in the matter covered by the claim, for the obvious hints to the mechanic existed in the systems proposed to be improved upon. If not, it is clear that the invention was that shown by the amendment of the specifications, and only that. The combination is useless without that feature, and the bringing it in would be the last step in reaching success. If it was invention, it was an invention not hinted at in the original application; and, if the patent is to be restricted to the substance of that application, the claim is invalid because the invention was not useful. As has been said, the bill does not allege an invention by Cody prior to the date of his application. And the latter does not carry the invention back to an earlier date. The evidence shows that the device, as patented, had been in public use for some time prior to the date of his application. If it be permissible, as contended, to maintain his patent upon evidence, dehors the proceedings in the patent office, that he had made the invention at an earlier date than is to be presumed from his application and patent, so as to carry it back to antedate the public use, the proof should be clear and unequivocal that he was the original inventor. Eagleton Manuf'g Co. v. West, Bradley & Cary Manuf'g Co., 2 Fed. 774, 777; Rob. Pat. § 1026, note 14, and cases cited. There is much evidence in this record upon that subject. Without here going into detail, it suffices to say that we have serious doubt whether Cody was the original inventor of the device represented by this combination of his patent. If the evidence in its favor were fortified by the presumption of validity afforded by the patent in ordinary cases, we might think it right that that should turn the scale, and that this claim in the patent should be held valid. But the presumption does not apply in such circumstances, and the burden of proof is

on the other side. We do not think it is sustained. This defense is not specially pleaded in the answer, but it is not necessary that it should be. Eagleton Manuf'g Co. v. West, Bradley & Cary Manuf'g Co., 2 Fed. 774, 780; Id., 111 U. S. 490, 498, 4 Sup. Ct. 593. In that case, as here, the file wrapper and contents were put in evidence by the plaintiff itself.

We are of opinion that the second claim cannot be supported, in view of the history of that element of the combination, without which the invention is not useful, and that the patent, as to that claim, is therefore void. The decree below should be reversed, and the bill dismissed.