## GEORGE CUTTER CO. v. METROPOLITAN ELECTRIC MFG. CO.

(Circuit Court of Appeals, Second Circuit.   June 23, 1921.)

No. 259.

1. **Patents ⊚⇒109—Absence of oath to new claims changing invention invalidates patent.**

   The absence of an oath to an amendment substituting new claims in an application is fatal to the patent, where the new claims involve a change in the actual invention,·and not merely in mechanical details.

2. **Patents ⊚⇒295—Prima facie case free from reasonable doubt required to warrant preliminary injunction.**

   Where a preliminary injunction is sought the burden is on complainant to establish a prima facie case free from reasonable doubt, and the presumption arising from the grant of the patent is not alone sufficient, nor is a prior adjudication sustaining the patent where new and material facts are alleged which raise a reasonable doubt of validity.

3. **Patents ⊚⇒328—Preliminary injunction on No. 920,490, for metering panel boards for electric power distribution, held not warranted.**

   An order granting a preliminary injunction on the McWilliams patent, No. 920,490, for a metering panel board for electric power distribution, reversed on the ground that the answer alleging failure to make oath to the claims in issue and invalidity for prior use raised issues which should only be determined on final hearing.

Appeal from the District Court of the United States for the Eastern District of New York.

Suit in equity by the George Cutter Company against the Metropolitan Electric Manufacturing Company.   From an order granting a preliminary injunction, defendant appeals.   Reversed.

C. P. Goepel, of New York City, for appellant.

Drury W. Cooper and Thomas J. Byrne, both of New York City, for appellee.

Before WARD, ROGERS, and MANTON, Circuit Judges.

MANTON, Circuit Judge.   The suit involves four patents:   No. 920,490, issued May 4, 1909; No. 931,464, issued August 17, 1909; No. 936,252, issued October 5, 1909; and No. 1,137,413, issued April 27, 1915—all for metering panel boards for electric power distribution. The injunction complained of involves only patent No. 920,490 to one McWilliams, and for the purpose of this appeal it will be necessary to consider only such patent.   Claims 1, 5, 6, 9, and 10 of the patent here considered were held valid and infringed in the Seventh circuit.   Beachey et al. v. McWilliams, 224 Fed. 717, 140 C. C. A. 257.   Infringement is admitted.   The requirement for the improvement of the art which this invention covers grew out of the requirements of office buildings and apartment houses where tenants pay for electricity consumed in lighting their respective premises.   For a single tenant occupying the entire building the incoming wires running through a single meter are registered.   All the energy consumed and the necessity of distribution so as to record the proper charges, is not presented in such case.   Where there is more than one tenant in a building, a

plurality of meters are required. From time to time there are changes made by the tenants in rearranging suites or lofts in buildings, and with it must follow changes in the circuits between each meter and the varying number of lamps whose currents are registered by it from time to time. Convenience and need for inspection require a common location for all the meters, and some mounting for the meter ends of the consumption circuits that should eliminate the time and trouble otherwise required to identify and register the wiring of the circuits to the several respective meters, as their requirements increase or diminish. It was found more economical in congested districts, where the area served by a central station is small, to generate direct currents and to distribute them through three wires. This gave rise to what is known as the three-wire system of distribution in large cities. This added connections at the place where the meters were located. The object of the invention is stated as follows:

"The object of the invention is to facilitate the interchanging of the consumption circuits with the meter circuits so that any consumption circuit may be readily connected to any meter, and as many consumption circuits as desired may be readily connected to any one meter.

"It is also an object to provide a compact, economical metering panel board usable in connection with such a system."

There are six consumption circuits and six meters accommodated on the device, which comprises a base consisting of a slab $A$ of marble or other suitable insulating material, upon which are mounted, first, the three terminals of a three-wire circuit, $a$, $b$, $c$; second, the terminals for six meters, $h^1$, $h^2$, $h^3$, $h^4$, $h^5$, and $h^6$, two for each meter, and therefore twelve in all; third, three "bus bars," $d$, $e$, $f$, connected to the meter terminals, the third or neutral bus bar, $f$, having downward extensions, $f^1$ and $f^2$, at the sides; fourth, a series of stationary metal strips or conductors, six in number, $i^1$ to $i^6$. They, like the extensions $f^1$ and $f^2$, extend longitudinally of the board, and each is connected to one of the several pairs of the meter-circuit terminals $h^1$ to $h^6$. Fifth, along the lower half of the right and left hand edges of the board are permanently mounted the pairs of consumption circuit terminals $k^1$ to $k^6$, each of which is adapted for connecting with an electric circuit extending to a room or other portion of an apartment or floor of a building. Each of these pairs of terminals is connected to the neutral base board extension $f^1$ to $f^2$, while its mate is connected to one of a series of six laterally conducting strips $j^1$ to $j^6$. These strips constitute the sixth group of instruments comprising the device, and they may be mounted on the opposite side of the insulating slab for the meter bars $i^1$ to $i^6$, or they may be otherwise separated therefrom. But in either location provision is made for connecting any consumption circuit bar $j^1$ to $j^6$ with any meter bar $i^1$ to $i^6$, and such means is shown as a plug or screw which penetrates holes provided in each at the point of superposition. That is, some or all of the lighting circuits may be connected with any meter by the simple act of plugging in the plugs or screws. The patent provides that the consumption circuit bars are mounted in staggered relation. The advantages referred to are as follows:

"By referring to the drawings it will be noted that one set of conductor bars is arranged alternately so that one bar leads to a terminal at one edge of the board while the next adjacent bar leads to a terminal at the opposite edge of the board. It will also be noted that in the preferred form these terminals include fuses and switches. The advantage in this alternate arrangement is that it affords double the area for the terminal connections for any given length of board, and consequently shortens the vertical conductor bars, and the board itself. Terminals consisting of switches are considerably wider than the conductor bars, and an ordinary board, to accommodate them, has to be much longer than it would have to be to accommodate merely the horizontal conductor bars; furthermore the vertical bars have to be very long to enable them to cross all of the horizontal bars. By my arrangement in which the terminal connections are grouped symmetrically on two sides of the vertical bars and the horizontal bars are led to them alternately, first on one side and then on the other, the vertical bars are just about half as long as they would be if grouped all on one side of the board."

Claims 1, 5, 6, 9, and 10 are involved. The appellee refers to claim 6 as best illustrative of the claimed invention. It reads as follows:

"6. A system of electrical power distribution including consumption circuits extending from districts of consumption to a panel board, bus bars on said board connected to said consumption circuits, meter circuits, other bus bars on said board connected to said meter circuits, means for interchangeably connecting the bus bars associated with the consumption circuits with the bus bars belonging to the meter circuits, one of said sets of bus bars being provided with terminals arranged along the two edges of the board, and connected to their bars alternately, substantially as described."

The advantages claimed are the ease of adjustment of the circuits to meters and readjustment in the hands of the most inexperienced. Such a need for adjustment arises when searching out and testing and identifying each wire with respect to the meters with which it is connected, or separating it from the tangle of wires on the conduit, or to make the proper connection of wires leading into the rooms of a particular tenant, becomes essential. When the wires leading to a tenant's apartment or suite are put upon one meter, the wires become fully identified, and are ready for instant adjustment or such care as the conditions require. The staggered arrangement of the consumption conductor bars is emphasized in the quotation above.

The answer and affidavits of the appellant interposed new defenses which were not before the court in Beachey et al. v. McWilliams, supra.

The answer pleads that the letters patent are void by reason of the fact that more than two years prior to the filing of the application for said letters patent, prior to the alleged invention thereof, there was a prior use in the United States, among other places, the Essex Hotel, in the City of New York. It is further pleaded that one Skeel, of Chicago, prior to the alleged invention of the patent in suit, in fact conceived the idea of the substantial and material parts of the patent, and that what the invention covers were well known in the art prior to the time of the alleged invention. In support of this, the file wrapper of the patent in suit is attached. This was not before the court in the Seventh circuit (224 Fed. 717, 140 C. C. A. 257). A defense is further interposed for the reason that it is asserted that the claims in suit are invalid because they are not supported by an oath. The claim is advanced that the file wrapper and contents indicate that the original

claims were rejected and canceled in the Patent Office; that the claims now in the patent were inserted by amendment three years after the application was filed; and that no supplemental oath was made by the inventor. From this it is argued that he has never made oath that he was the inventor of the device of the claims of the patent in suit. If this be a fact, it offers a defense. Steward v. American Lava Co., 215 U. S. 161, 30 Sup. Ct. 46, 54 L. Ed. 139. The file wrapper and contents show that claims 1, 2, and 3 were rejected on the patent to Mayer, No. 473,848. McWilliams then canceled claims 1, 2, and 3. The other claims remaining were renumbered 1, 2, 3, 4, and 5. Claim 5 was rejected and canceled by McWilliams, and four new claims were added and numbered 5, 6, 7, and 8. Adopting the suggestion of the examiner under rule 96 of the Patent Office, five new claims were inserted. An interference was then declared between claims 1, 3, 4, 5, 7, 9, 11, 12, and 13 of the McWilliams application and claims 12, 14, 15, 16, 18, 5, 7, 10, and 11 of the Skeel application, and those claims were involved in counts 1 to 9 of the interference proceedings. The interference proceeding was finally determined in favor of Skeel; McWilliams canceled the claims in the interference, 9 to 13, and added ten new claims. These now appear numbered 1 to 10, respectively. It will be noted that in the present suit claims 1, 5, 6, 9, and 10 are involved. No oath was made when these new claims were added to his application. The examiner was then requested to pass to issue the remaining claims in his application not involved in the interference, but those were rejected under date of December 4, 1908. It therefore appears that McWilliams canceled from his application all the claims that he made in his original application and all that he entered subsequently by amendment prior to November 17, 1908, together with the claims that he incorporated at the suggestion of the examiner, and which were in interference with Skeel. Thus, it is clear that McWilliams has made no oath to any of the claims entered by him in his application at any time prior to November 17, 1908, and which are described in the specific structure embodied in claims 1 to 10 of the patent in suit. He has made no oath at any time that he was the inventor of the structure embodied in these claims filed by him November 17, 1908, which, as mounted, form the basis of the patent in suit.

"The applicant shall make oath that he does verily believe himself to be the original and first inventor or discoverer of the art, machine, manufacture, composition, or improvement for which he solicits a patent." Section 4892 of the U. S. Revised Statutes (Comp. St. § 9436).

"If claims to the matter which has been described or illustrated in the application, but not claimed previously, be presented, a supplemental oath is required on the ground that the statute requires the applicant's oath not to what is described, but to what is claimed." Rogers on Patents, p. 37.

Did McWilliams make oath to a different subject-matter from that claimed in the patent in suit? The appellant contends that this history of the occurrences in the Patent Office, together with what is new in the patent, answers the question in the affirmative.

We think that this question should be passed upon at final hearing, and presents a question of sufficient debatable character as to make it

a subject for consideration at final hearing rather than to pass upon it against the appellant on an application for an injunction ad interim. By acquiescence in the rejection by the Patent Office and the cancellation of his other claims, in the interference with Skeel, McWilliams admits that he is not the inventor of his original claims to which he made oath; at least, such is the ruling against him. Nor is it sufficient answer to say that the drawings alone protect the appellee. If a new set of claims had been filed and appended to the original specifications without any change in the specifications, then such claims could not be supported on the drawings alone. Windle v. Parks, etc., Co., 134 Fed. 381, 67 C. C. A. 363. Drawings, at best, constitute only an illustrative representation of the alleged invention. To reduce an invention constructively to practice, it is required that the complete description, under oath, be submitted, a description such as will enable anyone skilled in the art to reproduce the invention. This is the compelling reason for the rule and safeguards the fundamental consideration which the law imposes for the grant of letters patent. It is imperative that claims be made to the invention sought to be protected. McWilliams' oath went only to the matters then described and to what was then claimed in the specifications annexed to such oath. The terms of the oath "are described and claimed in the annexed specifications." It doesn't say what is shown in the drawings alone. Specification means the description referred to. It does not include anything else than that described and claimed in the original description of the claims, and if the original description does not describe, nor the original claims claim, the subject-matter of the claims now in suit found in the device, there is therefore an utter lack of support by an oath of the invention in suit. Inventions are either generic or specific, and it does not answer to say that the change involved is merely a mechanical detail or the narrowing of the scope if, in fact, the claims were not originally asserted. It does not follow that one making an oath for a generic invention equally makes oath to a specific invention. If such were a permissible doctrine, a patentee of a broad invention would be enabled to bring within his oath and thus claim priority of every subsequent invention of a more specific nature. While it is possible for one who has a broad invention to restrain, for a time, a subsequent specific invention, he cannot use the specific invention without paying tribute to the inventor of the specific device. While it is true that under some patents specific claims to one species can be made under generic claims to the genus, that can only be done where full support therefor is found in the description, and it is fully supported by an oath. Where changes are allowed as to mechanical details to make some detail operative, it involves changes subservient to the invention actually claimed; but a change in the actual invention, even though slight, may render the oath of no value because that change in the actual invention would present a different invention than the one sworn to. It has been held that in the reissue cases it would open the door to fraud by the insertion of a different invention than the one sworn to.

[1] Under such circumstances, the absence of an oath to an amendment to the claims in suit is fatal to the patent. Steward v. Ameri-

can Lava Co., 215 U. S. 161, 30 Sup. Ct. 46, 54 L. Ed. 139; Mich. Central R. R. v. Consol. Co., 67 Fed. 121, 14 C. C. A. 232; Kiefer Co. v. Unionwerke (D. C.) 218 Fed. 487; Ney Mfg. Co. v. Swineford Co. (D. C.) 211 Fed. 469.

After describing a panel board, the inventor here claimed as his invention the combination of elements comprising it. But the file wrapper indicates that Skeel was granted the preference of the inventive thought. The claims then offered by McWilliams indicate an improvement over the device which was in interference over the Skeel device which was in interference, and which consisted of an alleged combination of elements. The idea seems to be the distributing bars arranged alternately on opposite sides of the board. That did not consist in narrowing the scope of the invention, but consisted in adding to the original invention the staggered relation after what was originally claimed.

Skeel stated as the object of his invention:

"This invention relates to metering electrical distribution systems, and is designed to provide an organization and apparatus which is particularly simple and compact, and which will admit of changes being made in the connection between the load circuits and the meters for distributing the permanent connections and with a minimum of effort and a rearrangement of parts.

"The present invention aims to provide a device or apparatus which is installed at the time a building is wired, and is constructed originally to provide for the probable maximum number of meters for independent users and the probable maximum number of load or translating circuits, and is adapted to be quickly altered for various appropriations of floor or office space of different users."

Now, McWilliams stated that his purpose is to provide a device of the class described, having "one set of conductors arranged alternately so that one conductor leads toward one edge of the board for connection in the circuit, while the conductors of either side thereof lead toward the opposite edge of the board for connection to other circuits." This seems to be the purpose of the substituted claims. They are more than mere changes in mechanical details. At least, such was the representation to the Patent Office when they were filed with the dignity of an amendment and new claims, and it was on the representation that the claims as filed anew were for a different invention than that of Skeel's invention.

The grant was allowed upon the theory not only that the structure was different from the prior art, and as it existed when McWilliams filed his application, but different from the subject-matter involved in the interference. No one is entitled to a patent on what was known in the prior art, because the very essence of an invention is that it was not known in the prior art.

In addition, the Essex Hotel use is averred to have occurred in 1901; if so, it was a prior use which would defeat the appellee. The appellee contends that the proof as to this is not sufficient to satisfy the court below beyond a reasonable doubt, but we think that it was sufficient, in view of what is now learned from the records of the file wrapper and contents to have been the condition of the prior art before the

grant of the invention, to have required the court below to await the determination of the final hearing before rejecting it by granting an injunction. At final hearing, where the question of the validity of the patent is attacked by the claim of prior use, and where the effort is supported only by oral evidence, such prior use must be established beyond a reasonable doubt. The reason therefor is that the burden of proof is entirely on the defendant to overcome the legal presumption carried by the patent itself. The reason for the rule is also that the power of observation of different persons differs; the power of recollection of different persons differs; the power of any person to recollect is dependent largely upon the lapse of time between the event and the time of giving testimony, and such testimony may be affected by reasons personal to the witness.

[2] But where a preliminary injunction is sought, the burden is upon the plaintiff to establish a prima facie case free from reasonable doubt. The presumption flowing from the grant of the patent alone does not entitle the inventor to his preliminary injunction.

The appellee recognizes this rule, but relies upon 224 Fed. 717, 140 C. C. A. 257, as its support. However, the decision in this case did not prevent the appellant setting up such new matters as it has done here. A prior adjudication is not a finality. It is limited to the relativity to the decision and facts in the prior case. A prior decision does not prevail in a subsequent case where the facts are different from those in the prior case or in addition to those of the prior case in respect of matters that establish a new state of facts. Cons. Valve Co. v. Safety Valve Co., 113 U. S. 157, 5 Sup. Ct. 513, 28 L. Ed. 939; Paul Steam System Co. v. Paul (C. C.) 129 Fed. 757; Hall Signal Co. v. Genl. Ry. Signal Co., 153 Fed. 907, 82 C. C. A. 653.

[3] We think that the defense interposed here makes out a case of unwise use of the discretion of the District Judge in granting the preliminary injunction, and, without passing upon the sufficiency of the defenses interposed, we think that the demands of justice require that the injunction be dissolved and the merits of the defenses be passed upon at final hearing.

Order reversed.