**CARTER–WALLACE, INC., Plaintiff-Appellee,**

v.

**DAVIS–EDWARDS PHARMACAL CORP., Defendant-Appellant.**

**No. 889, Docket 71–1256.**

United States Court of Appeals, Second Circuit.

Argued April 1, 1971.

Decided May 4, 1971.

---

Mansfield, District Judge, dissented and filed opinion.

Charles R. Brainard, New York City (Kenyon & Kenyon, Reilly, Carr & Chapin, Richard K. Parsell, Robert H. Morse, Nathaniel D. Kramer, Stuart J. Sinder, George E. Badenoch, New York City, and William H. Bisnoff, Woodside, N. Y., of counsel), for defendant-appellant.

George B. Finnegan, Jr., New York City, (Morgan, Finnegan, Durham & Pine, William D. Denson, Jerome G. Lee, John D. Foley and George P. Hoare, Jr., Breed, Abbott & Morgan, Edward J. Ross, Stephen R. Lang and Louis A. Mangone, New York City, of counsel), for plaintiff-appellee.

Before FRIENDLY and FEINBERG, Circuit Judges, and MANSFIELD, District Judge.*

FRIENDLY, Circuit Judge:

Davis-Edwards Pharmacal Corporation, now in an arrangement proceeding under Chapter XI of the Bankruptcy Act in the Eastern District of New York, appeals from an order of that court granting a preliminary injunction against its conceded infringement of the United

* Of the District Court for the Southern District of New York, sitting by designation.

States Patent 2,724,720 (Claim 4) for a drug known generally as meprobamate, issued on November 22, 1955, to Frank M. Berger and Bernard J. Ludwig, and assigned by them to plaintiff's predecessor, Carter Products, Inc. The pharmacological compound described in the patent has been made into pills by plaintiff and widely marketed as a tranquilizer under the trade name "Miltown." For many years the only other authorized user and seller of the single compound was the Wyeth Division of American Home Products Corporation, which manufactured it into pills marketed under the trade name "Equanil." As a result of a consent decree in 1962 in an action brought by the Government under the antitrust laws, United States v. Carter Products, Inc., 211 F.Supp. 144 (S.D. N.Y.1962), Carter Products' agreement with American Home was terminated, and it agreed to sell the compound to anyone at a price not to exceed $20.00 per pound, with a protective provision for increase based on the Consumer Price Index. Davis-Edwards purchased the compound from plaintiff at $20.00– $21.40 per pound from 1963 to 1968. Since that time it has been acquiring the compound from other sources, mainly foreign, at about 87 cents per pound. Defendant has not been by any means alone in following this course. Indeed, the largest infringer has been the United States, which began purchasing the compound from other sources at least as early as 1960 but was not sued by plaintiff until 1968.

Although Carter-Wallace was notified by the Bureau of Customs on June 11, 1968 that Davis-Edwards was purchasing meprobamate from foreign sources, plaintiff did not bring this action until October 9, 1969, and did not move for a preliminary injunction until December 22, 1970, some six weeks after this court had sustained the validity of the patent, against limited attack, in Carter-Wallace, Inc. v. Riverton Laboratories, Inc., 433 F.2d 1034 (1970).[1] Extensive affidavits, exhibits and memoranda were filed. Judge Dooling heard argument for three days. On the following day, February 25, 1971, he granted the injunction, after delivering an oral opinion which, including colloquy with counsel who were allowed to comment on his observations as he proceeded, fills 167 typewritten pages.[2] On the basis of defendant's representation that the loss of its meprobamate business and the effect of this on its sales of other generic drugs not only would preclude any possibility of a Chapter XI arrangement but would prevent its proceeding to trial in this action, a panel of this court, on March 11, 1971, stayed the temporary injunction on condition that the appeal be argued during the week of March 29. We appreciate the assistance rendered by counsel in the excellent briefs filed and the arguments prepared within the severe time limits thus imposed.

## I.

Davis-Edwards attacked the patent on three general grounds, the first two of which have some tendency to merge: invalidity over prior art, most of which was not previously cited; inequitable conduct of the applicants before the Patent Office; and patent misuse predicated on violations of the antitrust laws. Examination of the *Riverton* opinion, 433 F.2d at 1037, shows that none of the

---

1. Defendant filed under Chapter XI two days after the motion was served. After having stayed prosecution of the motion, the bankruptcy court vacated the stay.

2. The remarkable knowledge of the relevant chemistry and pharmacology displayed in Judge Dooling's oral opinion may have been due in part to his having

rendered a decision, a few weeks earlier, granting a preliminary injunction against another infringer, Carter-Wallace, Inc. v. Wolins Pharmacal Corp., 326 F.Supp. 1299 (E.D.N.Y.1971). Wolins apparently settled its damages for past infringement on what terms we do not know, and agreed that the injunction be made permanent.

specific points raised here was there presented or considered.[3]

■ Davis-Edwards' case for reversal rests fundamentally on the rule succinctly stated by Judge Learned Hand in Simson Bros. v. Blancard & Co., 22 F.2d 498, 499 (2 Cir. 1927), "We have often said that an injunction pendente lite in a patent suit should not go except when the patent is beyond question valid and infringed." He cited four cases, Newhall v. McCabe Hanger Mfg. Co., 125 F. 919 (2 Cir. 1903); Hildreth v. Norton, 159 F. 428 (2 Cir. 1908); George Cutter Co. v. Metropolitan Electric Mfg. Co., 275 F. 158, 164 (2 Cir. 1921); and A. B. Dick Co. v. Barnett, 277 F. 423 (2 Cir. 1921). He might also have cited Dickerson v. De la Vergne Refrigerating Machine Co., 35 F. 143, 147–148 (C.C.S.D.N.Y. 1888), where Judge Lacombe referred to "the wholesome and well-settled rule which requires an adjudication in court, or public acquiescence, as a necessary prerequisite to granting the relief [a preliminary injunction in an action for patent infringement] here prayed for," and Reed Mfg. Co. v. Smith & Winchester Co., 107 F. 719, 720 (2 Cir. 1901).

■ Perhaps because the rule, imposing on a patentee seeking a preliminary injunction against infringement a burden substantially heavier than the usual ones of showing irreparable injury and probability of success, was regarded as "well-settled" as long back as 1888, most of the later decisions shed little light on the reasons for it. In Rosenberg v. Groov-Pin Corp., 81 F.2d 46, 47 (2 Cir. 1936), Judge L. Hand addressed himself to its rationale:

> The doctrine that in the absence of long acquiescence or adjudication an injunction [i. e., a preliminary injunction in a suit for patent infringement] will not go, is at first blush anomalous in the light of the presumption of validity which courts generally grant to a patent once issued. * * * The theory is * * * practical. Examiners have neither the time nor the assistance to exhaust the prior art; nothing is more common in a suit for infringement than to find that all the important references are turned up for the first time by the industry of a defendant whose interest animates his search. It is a reasonable caution not to tie the hands of a whole art until there is at least the added assurance which comes from such an incentive.[4]

Indeed, a unanimous Supreme Court in Graham v. John Deere Co., 383 U.S. 1, 18, 86 S.Ct. 684, 694, 15 L.Ed.2d 545 (1966), noted the "notorious difference between the standards applied by the Patent Office and by the courts," and suggested that the "discrepancy" was due in part to "the free rein often exercised by Examiners in their use of the concept of 'invention,' " a result, perhaps,

3. Carter-Wallace cites against this the statement in *Riverton*, 433 F.2d at 1040, The Patent Office was extremely careful and deliberate in reaching its decision of patentability in this case and there is nothing in the record to suggest that it was not fully substantiated. But the record in *Riverton* does not at all reflect the issues raised here, and Judge Dooling was entirely correct in saying "I do not know what Judge Cannella [the district judge in *Riverton*] and Judge Anderson [who wrote for this court] would have said had they had the advantage of this material before them."

4. The presumption of validity accorded a patent regularly issued, referred to in the quoted passage and long recognized in judicial precedent, see, e.g., Radio Corp. of America v. Radio Engineering Laboratories, Inc., 293 U.S. 1, 7–8, 55 S.Ct. 928, 79 L.Ed. 634 (1934), was codified in 1952, 35 U.S.C. § 282. The Reviser's Note states: "The first paragraph declares the existing presumption of validity of patents." We have recently noted that the presumption "has no independent evidentiary value; rather, it serves to place the burden of proof on the person who asserts invalidity. Reasonable doubt on the issue of validity must be resolved in favor of the patent holder, but in the usual case a preponderance of the evidence determines the issue." Rains v. Niaqua, Inc., 406 F.2d 275, 278 (2 Cir.), cert. denied, 395 U.S. 909, 89 S.Ct. 1751, 23 L.Ed.2d 222 (1969).

of the enormous number of patent applications (nearly 100,000) which are filed each year. Without in any way disparaging the skill and devotion of patent examiners, to which our dissenting brother pays extensive tribute, and despite the statutory presumption of validity, the bald fact is that more than 80% of patent infringement actions on appeal result in a determination that the patent sued upon is invalid. Milgrim, Sears to Lear to Painton: Of Whales and Other Matters, 46 N.Y.U.L.Rev. 17, 31 & n.62 (1971). In apparent recognition of the potential unfairness of allowing one armed with letters patent obtained in an *ex parte* proceeding to prevent the conduct of business by others before he has submitted all fairly disputed issues of fact to a full adversary hearing and has won a favorable decision by some court, or the industry has in effect conceded the validity of his patent, the "wholesome and well-settled rule" has been followed in other circuits, although with differences in precise formulation. Packard Paper Box Co. v. O. B. Andrews Co., 67 F.2d 783, 784 (1 Cir. 1933); Leavitt v. McBee Co., 124 F.2d 938, 939–940 (1 Cir. 1942); Hoeme v. Jeoffroy, 100 F.2d 225, 226 (5 Cir. 1938); Flintkote Co. v. Philip Carey Co., 13 F.2d 850 (7 Cir. 1926); Stoody Co. v. Osage Metal Co., 95 F.2d 592, 593 (10 Cir. 1938): Pacific Cage & Screen Co. v. Continental Cage Corp., 259 F.2d 87, 88 (9 Cir. 1958) (*dicta*).[5] Carter-Wallace does not seriously question the existence or propriety of the rule, but rather contends that it comes within the exceptions relating to acquiescence and adjudication, and also that Davis-Edwards' insolvency constitutes a basis for a further exception.

■ Amplifying the explanation of what on its face seems a curious doctrine that acquiescence by others can affect one who does not, Judge Hand stated, Rosenberg v. Groov-Pin Corp., *supra*, 81 F.2d at 48:

Its only rational justification is that those whose interest would lead them to contest validity, have upon examination concluded that contest would be fruitless, and that that examination is some assurance of the truth.

5. While we do not suggest that all these cases would have been decided differently if they had not relied on the special rule with respect to preliminary injunctions in patent litigation, it cannot seriously be argued that the rule has been employed simply as a makeweight. Indeed, the only case to which we have been referred (and we have found no others) that rejects the general principle is Ryan v. Ideal Toy Corp., 260 F.Supp. 828 (C.D. Cal.1966). The district court, though acknowledging the enunciation of the generally accepted rule by the court of appeals of its own circuit, *see* Pacific Cage & Screen Co. v. Continental Cage Corp., *supra*, nevertheless felt its decision compelled by two earlier Supreme Court opinions, Radio Corp. of America v. Radio Engineering Laboratories, Inc., 293 U.S. 1, 55 S.Ct. 928, 79 L.Ed. 634 (1934), and Mumm v. Jacob E. Decker & Sons, 301 U.S. 168, 57 S.Ct. 675, 81 L.Ed. 983 (1937), which considered the presumption of validity that attends a patent regularly issued. Neither Supreme Court case either involved or adverted to the proper standard to be employed in the grant or denial of a *preliminary* injunction. There was no appeal from the district court's decision as the parties promptly settled the case after a motion to stay the injunction pending appeal was denied by the court of appeals. Though not yet disapproved, the *Ryan* case has never been cited. It is for the Ninth Circuit to determine whether its rather strong statement of the rule in the *Pacific Cage & Screen* case is still to be followed by district courts in that circuit.

In addition to the special rule discussed in the text, there are objections to the grant of a preliminary injunction on the basis merely of affidavits in any case where there are disputed issues of fact. F.R.Civ.P. 65(b), and 52(a). While this court has not gone so far on this score as Sims v. Greene, 161 F.2d 87, 88–89 (3 Cir. 1947) (Biggs, J.), see contra, Ross-Whitney Corp v. Smith, Kline & French Laboratories, 207 F.2d 190, 198 (9 Cir. 1953), we have stated in no uncertain terms that where there are disputed issues of fact, as we believe there are here, a temporary injunction should not issue on the basis of affidavits save in instances of extreme urgency. SEC v. Frank, 388 F.2d 486, 490–493 (2 Cir. 1968). See also Cerruti, Inc. v. McCrory Corp., 438 F.2d 281, 284 (2 Cir. 1971).

There are two reasons why that assumption is unwarranted here. First it is questionable whether there has been long acquiescence. The United States began to infringe some five years after the patent issued, and Judge Dooling characterized this as "significant breaches in the picture of acquiescence," despite his ultimate conclusion that there was acquiescence. Despite the considerations adduced in the dissent, one can hardly assume that the Government deliberately infringes patents it considers valid, and Carter-Wallace agreed to waive recovery for any use prior to November 9, 1962, Carter-Wallace, Inc. v. United States, 167 U.S.P.Q. 667, 669 n. 4 (Ct.Cl. 1970). More important, a considerable number of companies in the generic meprobamate market began to infringe the patent soon after the Government, an infringer certain to mount a vigorous defense, filed its answer to Carter-Wallace's complaint in the Court of Claims. However matters might have stood when the United States and Riverton were the only known infringers, there is no longer acquiescence in the generic meprobamate market. When general acquiescence ceases, any inference of validity which depends upon it is greatly weakened. Second, Davis-Edwards submitted an affidavit of its executive vice president, George R. Squibb, who had formerly held various offices with E. R. Squibb & Sons, a leading drug manufacturer, that the acquiescence of major pharmaceutical producers in the meprobamate patent had been due to factors other than belief in its validity,[6] a question to which the judge did not seriously address himself and an allegation which, if substantiated, would deprive industry acquiescence of its usual significance here.

Carter-Wallace's reliance on our adjudication of validity in *Riverton* is even more misplaced. Obviously an adjudication of validity in an action against another infringer is not *res adjudicata* against a different one. The theory of the prior adjudication exception is rather that a determination of validity after a full trial adds enough to what is now the statutory presumption, 35 U.S.C. § 282, to justify dispensation from the rule that a preliminary injunction will not be granted "except when the patent is beyond question valid." But this theory rests primarily on the basis that the objections urged in the second suit have been raised and overruled in the first. Our cases have so held. George Cutter Co. v. Metropolitan Electric Mfg. Co., *supra*, 275 F. at 164; National Electric Prods. Corp. v. Grossman, 70 F.2d 257, 258 (2 Cir. 1934). The *Riverton* decision would indeed justify a temporary injunction against a conceded infringer like Davis-Edwards if its only substantial objections were those urged by Riverton, namely, that the patent application did not satisfy the statutory requirement of showing utility, 35 U.S.C. § 101; that, by failing to disclose that the drug was intended primarily for humans and that tests had been carried out on them, the patentee did not comply with the requirement that the application disclose "the best mode contemplated by the inventor of carrying out his invention," 35 U.S.C. § 112; and that the same failure constituted a fraud on the Patent Office, see fn. 3 and accompanying text. Davis-Edwards relies not on those grounds but on others neither raised nor considered in *Riverton*. Perhaps also there may be instances where prior adjudication would arguably have an effect similar to acquiescence even on issues not litigated if it afforded sufficient basis for inference that there had been a "vigorous search of the art" and

6. These were that the industry thought it "better to have an invalid patent on meprobamate than to open up the widespread manufacture of meprobamate in the absence of a patent" and that Carter-Wallace's high pricing for meprobamate provided "a floor for the price structure of all of the subsequently developed tranquilizers." Mr. Squibb's affidavit also asserted that E. R. Squibb & Sons had decided not to pursue research on meprobamate since this "would not be a medically acceptable product" for inclusion in Squibb's line and its patent counsel believed "that a strong position on the patentability of meprobamate could not be maintained."

of other defenses and that the prior infringer's counsel had selected only those issues he considered to be substantial. On the other hand, we cannot blind our eyes to the fact that researching prior art and such defenses as concealment and misrepresentation is a costly and difficult business; the selection of only a few issues, most of them apparent on the face of the patent, as in *Riverton*, on which an infringer thinks he can win, thus affords scant rational basis for inferring that he deliberately discarded others as lacking merit. In any event, contrary to the suggestion in Carter-Wallace's brief that "competent counsel [in *Riverton*] was fully aware of such 'new prior art' and discarded it * * *," we now have an affidavit from Riverton's counsel averring that "[t]hat suggestion is categorically untrue."

■ While at first blush Carter-Wallace's argument that defendant's insolvency constitutes ground for another exception in its favor is appealing, this also does not withstand analysis. In the first place, we cannot wholly accept the statement that because Davis-Edwards is in a Chapter XI proceeding, plaintiff will be unable to recover damages from continued infringement, 35 U.S.C. § 284, if the validity of the patent is sustained. Section 64, sub. a of the Bankruptcy Act gives first priority to "the costs and expenses of administration, including the actual and necessary costs and expenses of preserving the estate subsequent to filing the petition * * *." There can be no doubt that this section applies to Chapter XI proceedings or that "the words 'preserving the estate' include the larger objective, common to arrangements, of operating the debtor's business

with a view to rehabilitating it," Reading Co. v. Brown, 391 U.S. 471, 475, 88 S.Ct. 1759, 1762, 20 L.Ed.2d 751 (1968). The Court there recognized potential tort damages of $3,500,000, substantially more than the assets of the debtor, due to losses in adjoining premises from a fire cause by the alleged (and, for purposes of the decision, assumed) negligence of a receiver for the debtor in possession, as priority claims subject only to administration expenses in a subsequent proceeding in straight bankruptcy, see § 64, sub. a. Damages for infringing a patent in the course of sales made for profit would seem an *a fortiori* case for priority. Cf. Diners Club, Inc. v. Bumb, 421 F.2d 396, 402 (9 Cir. 1970); 3A Collier on Bankruptcy ¶62.15 at 1540 (14th ed. 1969). While the schedule filed in the arrangement proceeding does show a rather thin equity over secured debts, it is not unreasonable to believe that Davis-Edwards will have sufficient assets to respond to plaintiff's recoverable damages for infringement if, as we direct, this action is promptly tried.[6a] Moreover, this claim is partly drained of its force by the defendant's offer of security, which we discuss in the concluding portion of this opinion.

■ In light of these factors, we do not feel compelled to reach a firm conclusion concerning Davis-Edwards' contention that because Carter-Wallace delayed sixteen months after learning of Davis-Edwards' infringement before filing suit and another fourteen months before it sought relief *pendente lite*, it cannot fairly complain that another three or four months delay until a trial on the merits would cause it irreparable injury. While plaintiff might respond that it assumed it could collect damages

---

6a. The equity shown is some $111,000. The $4,500 figure noted in the dissent represents only assets not encumbered at all. While the dissent downgrades this as a "paper balance," see fn. 1 thereto, there is no suggestion that the schedule overstates Davis-Edwards' assets. Moreover, Davis–Edwards' profits on meprobamate would not be the "only source to which Carter could look for satisfaction of its damage claim," as the dissent suggests, since Davis-Edwards manufactures between 50 and 100 drug products. The crucial importance of meprobamate to the continued operation of Davis-Edwards' business is that it is a high-volume "lead" product, without which Davis-Edwards' ability to sell other profit-producing products, even at a low volume, would be seriously impaired.

until Davis-Edwards filed its petition for an arrangement (an assumption that cannot be verified on the present record), and that in any event it could not have hoped to win a temporary injunction until the patent had been sustained by this court in Riverton, cf. Clair v. Kastar, Inc., 148 F.2d 644, 646 (2 Cir.), cert. denied, 326 U.S. 762, 66 S.Ct. 143, 90 L.Ed. 459 (1945), defendant would probably reply that plaintiff must have known at least since January 1, 1969, see Marked Pleadings, Carter-Wallace, Inc. v. Riverton Laboratories, Inc., 65 Civ. 4, that the *Riverton* decision would settle only a few points although at least some of those here raised by Davis-Edwards had already been interposed by the United States in Carter-Wallace's action in the Court of Claims in March, 1968. See Carter-Wallace, Inc. v. United States, 167 U.S.P.Q. 667 (1970). The record does not clearly indicate, however, the precise nature, extent, and timing of the prior art defenses raised by the Government—although Carter-Wallace alleges that "[d]efendant's counsel got prior art defenses from the Government." In any event, we do not mean to imply that this rather inconclusive exchange over the question of delay would disentitle plaintiff to a preliminary injunction if it met the appropriate tests; at most it reflects adversely on the special equities plaintiff claims to relieve it of the general rule.

## II.

■ Davis-Edwards contends that, once this point is reached, reversal is called for without more since, on its view, the judge, giving an undue effect to the *Riverton* decision, did not address himself to the question "whether the patent is beyond question valid" but rather applied the less rigorous standard of probability of success and, by taking into account the statutory presumption of validity, 35 U.S.C. § 282, in effect placed upon Davis-Edwards the burden it will have to carry at a trial, when, however, it will have had the benefits of discovery, cross-examination, and the presentation of live testimony. We do not read plaintiff's brief as seriously disputing this, although at argument counsel pointed out that some of the judge's remarks on which Davis-Edwards particularly relied were made after he had considered the substantive issues, and was weighing the more general considerations germane to the propriety of granting a preliminary injunction. In any event we cannot ignore the judge's unequivocal statement that were this not a case in which "the Court of Appeals had held the patent valid, on whatever bases, I would not think there was any basis on which an injunction could be granted." This is but one of many statements in the opinion which convince us that on this issue the defendant is right.

Nevertheless we are not disposed to reverse on this ground alone. While, for the reasons stated, we do not regard it as certain that plaintiff will not be able to recover damages if it establishes the validity of the patent, we should not subject Carter-Wallace to that risk if the record shows that a temporary injunction would have been justified under the appropriate standard. We are here reviewing not the decision of an administrative agency, but an order of a district court, and in view of the absence of oral testimony, are in as good a position as it was to determine whether a preliminary injunction would be justified under the proper standard. See Concord Fabrics, Inc. v. Marcus Bros. Textile Corp. 409 F.2d 1315, 1317 (2 Cir. 1969).

## III.

The opinions in *Riverton*, 304 F.Supp. 357 (S.D.N.Y. 1969) and 433 F.2d 1034 (2 Cir. 1970), give the highlights in the history of the patent application, which was first filed on July 29, 1950. However, in view of the limited issues raised, they were not required to state the molecular structure of the invention.

For this we cannot do better than quote from plaintiff's brief:

The basic molecule, from which the invention is derived, is propane:

$$\begin{array}{c} \text{H} \quad \text{H} \quad \text{H} \\ | \quad | \quad | \\ \text{H—C—C—C—H} \\ | \quad | \quad | \\ \text{H} \quad \text{H} \quad \text{H} \end{array}$$

When the end H atoms are replaced by OH, the result is 1,3 propanediol: *

$$\begin{array}{c} \text{H} \quad \text{H} \quad \text{H} \\ | \quad | \quad | \\ \text{HO—C—C—C—OH} \\ | \quad | \quad | \\ \text{H} \quad \text{H} \quad \text{H} \end{array}$$

The same compound can be written as

$$\begin{array}{c} \text{H} \\ | \\ \text{HO—CH}_2\text{—C—CH}_2\text{—OH} \\ | \\ \text{H} \end{array}$$

or as

$$\begin{array}{c} \text{R}_1 \\ | \\ \text{X—CH}_2\text{—C—CH}_2\text{—X}^1 \\ | \\ \text{R}_2 \end{array}$$

The key to meprobamate's outstanding performance is the substitution of particular atoms or groups for X and $X^1$ and for $R_1$ and $R_2$ in the 1,3-propanediol structure. In meprobamate, both X and $X^1$ are carbamate groups

$$\begin{array}{c} \text{O} \\ \| \\ (\text{NH}_2\text{—C—O}). \end{array}$$ $R_1$ is a methyl group ($CH_3$) and $R_2$ is a propyl group ($C_3H_7$):**

$$\begin{array}{ccc} \text{O} & \text{CH}_3 & \text{O} \\ \| & | & \| \\ \text{NH}_2\text{COCH}_2\text{—C—CH}_2\text{OCNH}_2 & & \end{array} \text{[meprobamate]}$$
$$\begin{array}{c} | \\ \text{C}_3\text{H}_7 \end{array}$$

The only references cited in the patent are a British patent issued to Baird in 1948 and three articles, the only relevant one of which is a 1949 article by one of the inventors, Dr. Berger, to which the parties refer as Berger I.

Davis-Edwards points to five other prior art references which, when considered along with the two just mentioned, allegedly make the invention of meprobamate obvious within 35 U.S.C. § 103. When the patent examiner rejected the initial application he did so on the basis of Baird and Berger I. Baird taught a process by which diols, that is those compounds with two hydroxyl groups (such as X and $X^1$) could be dicarbamated. While the particular compounds Baird was dealing with were not anticonvulsants, but rather were "useful as intermediates for the manufacture of compounds which are useful for the treatment of textile materials," Baird's substitution of carbamate groups for the hydroxyl groups over a broad range of diol compounds (to produce the dicarbamate ester of the parent diol) by implication embraced the particular 1,3 propanediol at issue here.

Berger I was a study of the pharmacological properties of a group of 1,3 disubstituted propanediols. A previously known drug, myanesin, a 1,2 propanediol, distinguishable from the 1,3 propanediol in that there is only one terminal hydroxyl group, the other being bonded to the middle carbon atom, was known to possess two important pharmacological properties: It caused transient paralysis of the skeletal muscles and had an anticonvulsant action. Berger I compared the pharmacological properties of a group of 12 disubstituted 1,3 propanediols with those of myanesin and found that the former "differ from myanesin in having a weaker paralyzing action and a more powerful anticonvulsant action." More specifically, Berger injected mice with metrazol—a substance "which caused convulsions and deaths in 99% of the animals"—along with graded doses of the compound under test. The animals were observed for 90 minutes following the injection and the incidence of convulsions and deaths noted. Using myanesin as a

---

* 1,3 refers to the first and third carbon atoms of the propane part of the molecule where a hydrogen atom (H) has been replaced by a hydroxyl (OH) group.

** Note that the $R_1$ and $R_2$ substitutions both occur on the second carbon atom. For this reason, the chemical name of meprobamate is 2-methyl-2-propyl-1,3-propanediol dicarbamate.

standard of comparison, Berger found that a number of the compounds had better or roughly comparable anticonvulsant properties when compared with myanesin and that others showed little or no anticonvulsant activity. The most effective was 2,2-diethyl-1,3-propanediol. The next most effective was 2-methyl-2-n-propyl-1,3-propanediol, the parent propanediol of the patent in suit.

The significance of Berger I was that it identified six or seven 1,3 propanediols having effective anticonvulsant properties. After Berger I, a scientist attempting to develop an anticonvulsant would probably not continue to investigate various $R_1$ and $R_2$ disubstitutions but would start with the particular $R_1$ and $R_2$ disubstitutions in the propanediols which Berger I had found possessed effective anticonvulsant properties and work from there. It was on this basis that the initial application was rejected. The examiner reasoned that since the process of dicarbamation was known as shown by Baird and since Berger had already revealed a few compounds (the homologues of which were disclosed by Baird) with anticonvulsant properties, a chemist familiar with this would try out the Baird process of dicarbamate esterification on the Berger compounds and come up with the invention in question, since the dicarbamate ester of Berger's compounds "would be expected to have similar [i. e., anticonvulsent] properties."

Berger then set out to show that dicarbamation of the 1,3 propanediol in question was not so obvious as all that—indeed that the result was unexpected in terms of its unique anticonvulsant properties and perhaps even counterindicated —which he ultimately did to the satisfaction of the patent examiner. Whether he was fair in his efforts to demonstrate this will be considered below. The question here is whether the other alleged prior art references cited by Davis-Edwards, when considered in conjunction with Baird and Berger I, raise a substantial issue whether the invention was obvious.

Three of the five important references are concededly *prior* art: Berger II, a 1949 article in a technical journal; Kraft, a 1945 article; and a 1901 patent to Bonhoeffer. Berger II dealt with myanesin, whose anticonvulsant properties were compared with those of the 1,3 propanediols discussed in Berger I. Previous studies had shown that the oxidation of the terminal hydroxyl group rendered a major part of the myanesin molecule ineffective. Berger sought to prevent this by protecting the terminal hydroxyl through esterification and in particular by the substitution of the acid succinate for the terminal hydroxyl to produce myanesin acid succinate (MAS). Two conclusions in the summary in Berger II are of particular interest: that the succinate esterification of the terminal hydroxyl gave MAS a much longer duration than the parent propanediol (myanesin) although the intensity of the pharmacological effects (paralyzing action) was lower than in the parent; and that "the study of other organic esters of Myanesin therefore appears warranted." [7] Berger II was received for publication two months prior to the like receipt of Berger I.

The importance of Berger II must be considered in light of what the patent application claimed. The principal claim was that meprobamate (i. e., the dicarbamate ester of 2-methyl-2-n-propyl-1,3-propanediol) had qualities of both inten-

7. Berger II also noted that MAS was inferior to myanesin "because of the high paralyzing dose and smaller margin of safety." This follows from the fact that MAS has a less intense effect than myanesin, hence larger doses are necessary to produce paralyzant activity, and these doses may prove to be lethal. But, of course, Berger II was attempting to find a means to *prolong* the effects of myanesin, which MAS did. Hence, as Berger II noted: "The low paralyzant activity of MAS did not discourage our interest in the drug since the therapeutic effects of Myanesin itself are exerted by subparalytic doses. There is the possibility that the paralyzing dose as measured experimentally is not a true index of the potential clinical value of a drug of this type."

sity and duration much greater (and most significantly, unexpectedly greater) than its parent propanediol. Berger II shows that the succinate esterification of a 1,2 propanediol has both a negative and a positive effect in terms of what Berger was looking for and found in meprobamate. The parent compound can be distinguished from the 1,3 propanediols which are the subject of the patent both in terms of its primary quality as a paralyzing agent rather than an anticonvulsant and in terms of its chemical structure, having only one terminal hydroxyl rather than two. Moreover, the esterification was through the use of acid succinate rather than through the use of a carbamate group, and the essential claim to novelty is that carbamate esterification produced unique and unexpected properties in the resultant compound that other organic esters would not have. On the other hand, as noted above, Berger II suggested that the study of other organic esters of myanesin appears warranted; and it is clear the article does reveal that the esterification of this propanediol lengthens its effect. Moreover, the fact that Berger II involved *mono*-succination does not deprive it of significance, since it is the esterification of the terminal hydroxyl to prolong its effect which is indicated, and myanesin had only one such hydroxyl, while the 1,3 propanediols had two. Hence to the extent that esterification of the terminal hydroxyl was seen as a process to have some usefulness in terms of enhancing the duration of a parent propanediol's activity, it cannot be deemed necessarily to lead away from the invention of meprobamate and might well have suggested the actual method which was used to discover it. The facts that dicarbamation of *myanesin* actually "ruined it" and that there was a cleavage effect in the myanesin succinate which was not present in the meprobamate lose a good deal of the force urged by Carter-Wallace when it is recognized that dicarbamation of myanesin apparently was not discovered until *after* the discovery of meprobamate and that the precise activity of meprobamate, could not be learned until it was produced. In sum, while Berger II was less than a beacon illuminating the path to meprobamate, its teachings might well have been helpful to one who was experimenting in the field and was armed with the knowledge that Berger I and Baird imparted.

Kraft and Bonhoeffer can be considered together. Both indicate that the carbamate esters of a number of compounds, which are chemically distinct from the propanediols, will have a soporific, sedative or hypnotic effect, in terms of the resultant activity of the compound in question. The principal argument for the relevance of these references is that they show that carbamates generally produce the kind of effect that meprobamate successfully embodied, and that in light of the teaching of Berger I, the carbamate esters of the anticonvulsants revealed therein would be an obvious choice for one seeking to enhance the anticonvulsant effect of a parent compound through esterification, as suggested by Berger II. The principal argument to the contrary is that both in chemical structure and in terms of the precise "anticonvulsant" effect sought, these compounds were a far cry from anything closely related to the 1,3 propanediol in question. This seems sound if but only if there is a significant distinction between soporifics, hynotics, anticonvulsants, and muscle relaxants—an issue which cannot be properly determined on the present record. While there are distinctions among the various effects described, many of these compounds produced a number of them, and inquiry into one would not preclude simultaneous inquiry into another.

The two other references cited by Davis-Edwards are characterized as Yale I and Yale II. Yale was a member of a group at E. R. Squibb & Sons, which was doing research on muscle relaxants. Dr. Berger, then a professor at the University of Rochester, had acted at one time as a consultant to this group although he claims to have terminated this role in

March 1949 and joined Carter Products Inc. in June.

■ The initial question with respect to these references is whether the art is *prior* at all. While the publication of Yale I and II concededly was after the initial patent application, both were delivered as presentations before a meeting of the American Chemical Society in September 1949, before the patent application was filed. It now appears from further discovery, as it did not at the argument before Judge Dooling, that during the late fall of 1948, Lott, one of the co-authors of the Yale articles, who was providing Berger with some of the basic anticonvulsants he was investigating, as Berger acknowledged in Berger I, had in fact provided him with the monocarbamate of the 2,2 diethyl propanediol, discussed below, and that Berger's co-inventor, Ludwig, did in fact attend the conventions where the papers were read, although he claims to have no recollection of their presentation. While this is an area for further fact-finding, there is legitimate ground for scepticism that Ludwig, who was working in the very same areas as Yale et al. and whose co-inventor was receiving compounds from one of the Yale I and II authors, did not at least hear about the substance of these papers from his fellow scientists. In any event, whatever question the district court had about Yale, and these were serious ones, the post-hearing revelations give added support to Davis-Edwards' position,[8] particularly since it is now clear that the Yale I and II references were not part of Berger's own work, a possibility on which Judge Dooling had relied in part in discounting them.

The significance of the Yale articles, particularly Yale II, is that they show that someone (with ordinary skill in the art) was systematically investigating essentially the same compounds whose pharmacological properties Berger I had explored, *compare* Berger I at 271 (table) *with* Yale II at 3717 (table), and indeed that the most effective anticonvulsant taught by Berger I (the diethyl 1,3 propanediol) had been monocarbamated. Yale I, which reported on the synthesis of a number of compounds similar to myanesin, discussed above, discloses myanesin monocarbamate. In light of Berger II's disclosures, with respect to myanesin succinate and its suggestion that the study of other organic esters of myanesin was warranted, the fact that the carbamate ester, which the prior art might have suggested would produce activity of the sort Berger was investigating, was one of those synthesized cannot be regarded as by any means irrelevant. It is true that the activity of the carbamates are not reported, but that was not the specific goal of either Yale I or Yale II. Rather they were concerned with the synthesizing of a number of propanediols (Yale II, in particular, describing most of those studied in Berger I), and, as mentioned, with the monocarbamation of myanesin and the diethyl-1,3-propanediol.[9] What gives Yale II particular significance is that esterification in general (see Berger II) and carbamate esterification in particular (see Yale I) was in fact being applied to a 1,3 propanediol which was known to have good anticonvulsant properties. In other words, once

---

8. While we could hardly use this material as a basis for reversal if the district judge had applied the proper standard, we may appropriately take note of it when we are considering whether to affirm despite his failure to do so. The production of such important material on discovery illustrates the wisdom of "the wholesome and well-settled rule" recognized by our predecessors.

9. We regard it as not insignificant, however, that both Yale I and Yale II refer to other articles for the pharmacological evaluation of the properties of the compounds under consideration, which suggests that those who were reporting on the synthesizing of these compounds were not unaware of their possible use. Indeed, the reference in Yale I is to a study by Lott, one of the co-authors of the Yale articles, which tends to undermine the suggestion in Carter-Wallace's brief that the synthesizers can somehow be distinguished from the evaluators.

someone had synthesized the carbamate ester of a propanediol known to have good anticonvulsant properties, as Yale II did (although admittedly without indicating the pharmacological implications), it became much more likely that one interested in the effects would attempt to use carbamate esters in the relatively few propanediols with known anticonvulsant properties to test out their effects, given what the prior art suggested with respect to esterification in general and carbamation in particular.

Again, it is true that Yale II did not teach a dicarbamate; that many of the paths it might have suggested would be dead ends; and that it is a jump from the particular monocarbamated propanediol there described to the dicarbamated propanediol, meprobamate. Nevertheless, Yale II did teach the carbamation of a propanediol listed in the same table with the parent propanediol in question and having similar properties. And it was the very carbamate disclosed by Yale II which Berger had requested of Lott and received from him. That in itself goes a long way towards refuting the contention that Yale II was irrelevant to Berger's investigations. This added information enhances the force of Judge Dooling's statement that given Yale II "it certainly would be difficult to say * * * that there wouldn't be an enormously important block to granting [a] product patent suddenly standing athwart the prosecution, if, as we are satisfied, the patent is critically a prod-

uct patent and not a patent on undiscovered utilities within a disclosed product."

We agree that a pharmacological patent should not be invalidated as obvious simply because, years after its issuance, an infringer has discovered recondite references in seemingly unrelated fields of chemistry, which hindsight shows might have come sufficiently close to the solution that this would have been obvious "to a person having ordinary skill to the art" to which the invention pertains, 35 U.S.C. § 103. But, except for Bonhoeffer, the prior art here discussed dated back at most five years from the patent application and was in the very field of pharmacology wherein Berger and Ludwig were working. The subject was surely one where even, perhaps particularly, a judge so thorough and so expert in patent matters could derive enlightenment from hearing the testimony of scientists, listening to their cross-examination, and even questioning them himself, rather than only the argument of lawyers based on their affidavits.[10] Contrast G. B. Lewis Co. v. Gould Products, Inc., 436 F.2d 1176, 1179 (2 Cir. 1971). We would not wish at all to be understood as instructing the district judge to hold the meprobamate patent invalid as obvious in light of what could be found to be the prior art. We hold only that, as he recognized, "there was a great deal more to the point of validity than appeared at first blush"—enough more than that the district court could not properly regard the patent as valid "beyond question."[11]

10. Defendant submitted an affidavit of a professor of chemistry at the Stevens Institute of Technology that meprobamate was obvious to one skilled in the art in light of the references now cited. Plaintiff responded with a counter-affidavit by a professor at Columbia.

11. Although we do not rest our conclusion on Indiana General Corp. v. Krystinel Corp., 421 F.2d 1023 (2 Cir.), cert. denied, 398 U.S. 928, 90 S.Ct. 1820, 26 L. Ed.2d 91 (1970), a case on which defendant's brief places too much reliance and plaintiff's unwisely ignores, Judge Medina's statement, with respect to a chemical patent for a soft ferrite mani-

festing a high Q-factor at high frequencies, bears repeating:

Thus the only difference between the prior art and Zerbe's alleged invention is the ascertainment of the proportions of manganese oxide and cobalt oxide that will produce a high quality factor and a sufficient permeability. Just what will be the exact proportions to supply the needs of particular products may require a large amount of experimentation. But this very experimentation is of the essence of the art involved in this lawsuit; it is on the level of ordinary skill in the art. This is all the more true because the practitioners of

## IV.

We reach the same conclusion with respect to the defense of misconduct before the Patent Office. By way of preliminary it is useful to note that, as the Court of Customs and Patent Appeals has recently written, the concept of misconduct now goes considerably beyond the classical definition of "fraud," see Prosser, Torts, §§ 100–05 (3d ed. 1964), and includes "a wider range of 'inequitable' conduct found to justify holding a patent unenforceable," Norton v. Curtiss, 433 F.2d 779, 793 (1970). The Court continued, *id.* at 793–794:

> we do subscribe to the recognition of a relationship of trust between the Patent Office and those wishing to avail themselves of the governmental grants which that agency has been given authority to issue. The ex parte prosecution and examination of a patent application must not be considered as an adversary proceeding and should not be limited to the standards required in inter partes procedings. With the seemingly ever-increasing number of applications before it, the Patent Office has a tremendous burden. While being a fact-finding as well as an adjudicatory agency, it is necesarily limited in the time permitted to ascertain the facts necessary to adjudge the patentable merits of each application. In addition, it has no testing facilities of its own. Clearly, it must rely on applicants for many of the facts upon which its decisions are based. The highest standards of honesty and candor on the part of applicants in presenting such facts to the office are thus necessary elements in a working patent system. We would go so far as to say they are essential. It follows, therefore, that we do approve of the

indicated expansion of the types of misconduct for which applicants will be penalized.

See also Precision Instrument Mfg. Co. v. Automotive Maintenance Machinery Co., 324 U.S. 806, 816, 65 S.Ct. 993, 89 L.Ed. 561 (1945); Beckman Instruments, Inc. v. Chemtronics, Inc., 428 F.2d 555, 565 (5 Cir.), cert. denied, 400 U.S. 956, 91 S.Ct. 354, 27 L.Ed.2d 264 (1970).

Davis-Edwards' claim of impropriety in failing to bring Berger II, Yale I and Yale II to the attention of the patent examiner hinges on the question of their importance as prior art which we have just discussed including, of course, the issue—with respect to which recent disclosures have strengthened Davis-Edwards' position—whether Yale I and Yale II are prior art at all. It is true that none of these references specifically deals with the subject of the patent, at least with respect to its qualities of added intensity and duration as compared to its parent propanediol. On the other hand, each reveals the esterification (and in two instances carbamate esterification) of either the related compound of myanesin (myanesin monosuccinate in Berger II, myanesin monocarbamate in Yale I) or of one of the very 1,3 propanediols shown by Berger I to have good anticonvulsant properties (the 2,2-diethyl-1,3-propanediol monocarbamate in Yale II). Berger was obviously glad to learn that Lott had synthesized the carbamic acid ester of the diethyl propanediol (a 1,3 propanediol), although only in its monocarbamate form. There is no reason to think the patent examiner would not also have liked to know this, and also of Berger II and Yale I which tended to reinforce the notion that carbamate esterification was not a shot in the dark. We agree with the statement in Xerox

---

this art are, and of necessity must be highly educated, sophisticated persons who generally have at their disposal laboratory facilities and competent assistants.

*Id.* at 1030–1031. While it would appear —and we say this without intimating that it will so appear after trial—that the

prior art delineated a substantially clearer path to the result sought and ultimately achieved in *Indiana General* than here, the suggestion that "experimentation is of the essence of the art involved in this lawsuit," is as applicable to the instant case as it was to *Indiana General.*

Corp. v. Dennison Mfg. Co., 322 F.Supp. 963 (S.D.N.Y. 1971), that in order for nondisclosure to constitute inequitable misconduct there must be something more than negligence—that there must be "some element of wrongfulness, wilfulness or bad faith that transgresses the basic concept of doing equity." But we do not regard it as foreclosed that after a full trial, a court might conclude that Berger's failure to disclose any of the three articles was just that, rather than the "exercise [of] good faith judgment in deciding what matters are and are not of sufficient relevance and materiality to require disclosure." *Id.* at 968–969. Here again it is important that we are dealing not with articles. Berger may have read in the remote past but with very recent publications, one by himself and two by his former colleagues at Squibb, which (were he in fact aware of the latter) must have been in the forefront of his mind. It is no answer that the patent examiner could also have found them. The paucity of references cited, with the only prior art patent relating to chemicals useful in the textile industry, raises an issue with respect to the failure to supply the examiner with more relevant material, concerning which the inventors, and perhaps also the examiner if he is available, should testify and be cross-examined. It may be said that this issue is not a true question of fact since the non-disclosure is conceded, and the problem is the proper characterization of the inventors' conduct, which will here be decided by the judge since we gather no jury has been demanded. But it is still true, as with the similar problem concerning summary judgment, see United States v. Diebold Inc., 369 U.S. 654, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962), that oral testimony, particularly demeanor under cross-examination, might powerfully assist in determining what inference to draw.

The major claim with respect to misrepresentation concerns an affidavit of July 1952 in which Berger asserted that the dicarbamates possess greater protective action than their parent propanediols (which was true) and that other esters, in particular the diacetate ester of one of the propanediols (the 2,2-diethyl-1,3-propanediol), disclosed in Berger I as having very effective anticonvulsant properties, was "less effective than the parent." This was directed at the patent examiner's rejection of the initial application on the ground that the carbamate esters would be expected to have the same properties as their parents and hence did not constitute invention. Berger was trying to show that not only did the dicarbamates have an unexpectedly better anticonvulsant properties but also that esters other than carbamates actually produced compounds that were less effective than their parents, thereby enhancing his claim to the inventive quality of his use of carbamates. Although the patent application was again rejected, the affidavit was nonetheless material since he had thereby demonstrated the superiority and unexpectedness of the dicarbamate esters in comparison to other esters noted in his affidavit and all he then had to do was to narrow his claim to those esters including unexpected properties and to verify the fact that the dicarbamate was unexpected in comparison to Baird, the "textile" compound.[12]

12. The Examiner's letter stated that "the applicants' affidavit of July 9 fails to establish patentability on the basis of unexpected properties since
1. Broad claim 1 is inclusive of members not showing unexpected properties. For example, when $R_1$ and $R_2$ are ethyl and phenyl it appears the dicarbamate is inferior to the diol.
2. Claim 10 covers a member which has no unexpected properties. The mean protective dose of the ethyl ethyl dicarbamate does not appear to be significantly different from the mean protective dose of the ethyl ethyl diol compound. This is particularly true in view of the standard error.
3. No showing has been made with respect to the homologues and isomers disclosed by Baird. Homologues and isomers are unpatentable in the absence of a verified showing of unexpected properties.
As noted in the text, all Berger had to do to meet the first two objections was to eliminate from his claim those dicarba-

The question is whether Berger was fair in basing his representation to the Patent Office as to the inefficacy of the diacetate ester only on the 30-minute interval (which he stated) without making reference to the fact that the diacetate ester was more effective than the parent propanediol at the 60, 90, and 120 minute intervals (which he did not state), as an article co-authored by Berger before the time he made the affidavit had shown. Two things should be pointed out: The parent propanediol in question did have a stronger intensity than the diacetate ester at 30 minutes, but then significantly decreased in intensity from 60–120 minutes while the diacetate maintained some of its strength. Second, when Berger spoke in his affidavit of the superiority of the dicarbamate as compared with the parent propanediol in terms of duration, he failed to mention that the diacetate ester also showed prolongation of effects. In short, what Berger did was to compare the diacetate ester with the parent in terms of intensity (to show that it was "less effective" than its parent, unlike the dicarbamate) and then compare the dicarbamate with the parent propanediol in terms of duration, to show the greater prolongation properties of the dicarbamate, not mentioning that the diacetate also had these properties. Had this been disclosed, it certainly would have shown that other esters as well as the dicarbamate had certain desirable properties. (Cf. Berger II, with respect to myanesin succinate.) This would have detracted somewhat from the claim of the uniqueness of the carbamate ester and perhaps have led the examiner to conclude that the claims of unexpectedness with respect to carbamate were not justified. While the

judge recognized that the question was "close" and the point "substantial" he thought it was not

one which at this stage of the case and for present purposes should be resolved in favor of the patentee and the plaintiff, since to make a finding * * * even for today's purpose would require rejection of the inference that substantial people don't do treacherous and insubstantial things when advised by counsel of standing, and that what seems at this point an unsatisfactory lack of forthcomingness may readily lend itself to explanations of greater depth.

The many cases in which patents have been held unenforceable because of inequitable conduct by "substantial people" show that the inference is a rebuttable one, as the judge clearly recognized. While the inference, and the explanation, might well suffice to sustain a negative finding as to misrepresentation if the standard here were the ordinary one of probability of success or under the rule that would be applicable after a trial, the long-standing rule in this circuit required that "explanations of greater depth" should be presented before issuing a temporary injunction in a patent infringement case. Our comments with respect to the value of oral testimony in resolving the significance of Berger's seeming "lack of forthcomingness" concerning Berger II, Yale I and II, and the receipt of the carbamate from Lott apply equally in resolving the issue of his failure to give the patent examiner the entire story concerning the diacetate ester.

In view of the conclusions we have reached on the issues of prior art, concealment and misrepresentation by the

mates which were not unexpectedly effective. The other objection simply required him to show that those dicarbamates, whose properties he had persuaded the Examiner were unexpected in comparison with the anticonvulsant compounds with which he had been working (see Berger I), were similarly unexpected in comparison to the compounds disclosed by Baird. The initial rejection

in May, 1954 of the continuation-in-part application, which acknowledged a "showing of superiority," stated only that "how much of a dose must be given before a compound is labeled ineffective has not been specified" and "no showing of superiority over the propanediols diurethanes of Baird has been presented." Berger then submitted affidavits to meet these objections and the patent was granted.

Berger affidavit, we find it unnecessary to consider Davis-Edwards' other claim of misrepresentation or its arguments with respect to patent misuse.

## V.

■ Our action in vacating the temporary injunction is predicated on defendant's offer to go to trial on July 15, conditioned only on plaintiff's giving discovery without delay. We read that condition to mean reasonable discovery; defendant must not be allowed to prolong its freedom from injunction by discovery on matters of merely peripheral significance. Rule 65(a)(2) gives the judge ample power to prevent undue delay if need for this should arise.

We also condition our order on Davis-Edwards' carrying out its offer to pay into escrow under the supervision of the referee in bankruptcy 5% of the gross proceeds of its sales of meprobamate. This should date from February 25, 1971, when the temporary injunction issued. While normally no security would be required from a defendant against whom a preliminary injunction was issued in error, this condition is not unreasonable when the reversal is grounded on the especially severe rule applicable to the issuance of such injunctions in patent infringement cases. The equity of such a condition is all the more evident when the ability of the defendant to respond in damages in the event of judgment against it is questionable. Plaintiff points out that, although 5% was the royalty on American Home's sales of Equanil tablets, the percentage was applied to a much higher base than the $5–$7 per pound at which defendant sells tablets under the drug's generic name; it claims its damages would be

the $20 per pound paid by manufacturers who buy from it. Defendant challenges this, arguing that, in the face of competition by other infringers, it could not have afforded to purchase the compound from Carter-Wallace; in light of the doubt whether defendant's disappearance from the market might not have meant simply its replacement by other infringers, we are by no means convinced of the validity of plaintiff's claim.[13] It will be time to consider such questions when and if the validity of the patent has been sustained. At least plaintiff will be better off with the escrow payment than without it.

Upon these conditions we vacate the temporary injunction and leave the case in the hands of the capable and diligent district judge. We repeat that we have not in any way decided that the defenses, so ably criticized by our dissenting brother, have such merit as to entitle defendant to prevail; we have decided only that they have sufficient merit to require decision after discovery and the taking of evidence on material issues where there is fair dispute concerning the facts or the inferences to be drawn therefrom.

The mandate shall issue forthwith.

MANSFIELD, District Judge (dissenting):

Although I agree with some of the views expressed by Judge Friendly in his thorough opinion, I differ on certain crucial issues and hence must dissent.

Were it not for the Court's adherence to an old doctrine, which seems to have been blindly followed by some over the years, to the effect that a preliminary injunction should not issue in a patent infringement suit "except when the patent is beyond question valid and in-

---

13. Cf. Power Specialty Co. v. Connecticut Light & Power Co., 80 F.2d 874, 875 (2 Cir. 1936); Electric Pipe Line, Inc. v. Fluid Systems, Inc., 250 F.2d 697, 699 (2 Cir. 1957) (lost profits awarded on findings which "justify the conclusion that but for Electric Pipe's infringement, Fluid Systems would have made all these installations"). In American Safety Ta- ble Co. v. Schreiber, 415 F.2d 373, 378 (2 Cir. 1969), cert. denied, 396 U.S. 1038, 90 S.Ct. 683, 24 L.Ed.2d 682 (1970), cited by the dissent, lost profits were awarded on the basis of the district court's finding that "but for defendants' sale * * * purchasers would have bought from plaintiff in order to supply their need."

fringed," Simson Bros. v. Blancard & Co., 22 F.2d 498, 499 (2d Cir. 1927), it is evident that the district court's grant of preliminary relief in this case would be affirmed. There was substantial supporting evidence for Judge Dooling's finding of validity. Infringement is conceded, and the insolvency of Davis-Edwards ("Davis" herein) provides a sound basis for his conclusion that a suit for damages at law does not provide an adequate remedy. Tropic-Aire, Inc. v. Jumper, 28 F.2d 631 (D.Minn.1928), overruled on other grounds, Tropic-Aire, Inc. v. Sears, Roebuck & Co., 44 F.2d 577 (D.Minn.1930); Norstrom v. Wahl, 27 F.2d 637 (7th Cir. 1928); cf. Thompson v. New York Central R. Co., 361 F.2d 137, 145–146 (2d Cir. 1966).

No one questions the fact that meprobamate (2-methyl-2-propyl-1,3 propanediol dicarbamate) had not existed before it was created in 1950 by its inventors, Drs. Frank M. Berger and Bernard J. Ludwig. Nor is there any doubt that it represented a major advance in the field of anticonvulsants, possessing markedly greater activity, strength, duration and utility than existing compounds. Judge Dooling found, for instance, that meprobamate yielded surprising results (which he described as "unexpectedness") in the light of the teaching of the prior art (Opin. pp. 106–07). Since its first public sales in May 1955, the product, because of these unique and superior qualities, has been widely accepted by the medical profession and preferred over existing drugs that might be prescribed for the same purpose, with the result that it has enjoyed great commercial success. Davis seeks to avoid enforcement of Carter's meprobamate patent (No. 2,724,720) on the grounds that the invention was obvious, that prior art was concealed from the Patent Office, and that the patent has been misused.

As the majority recognizes, upon the filing of Carter-Wallace's ("Carter" herein) motion for a preliminary injunction on December 22, 1970, Judge Dooling was inundated by the parties with extensive affidavits, exhibits and memoranda relating to Davis' defenses. Having granted preliminary relief in response to a similar motion in Carter-Wallace, Inc. v. Wolins Pharmacal Corp., 326 F.Supp. 1299 (E.D.N.Y.1971), and having had the benefit of the opinions of the district court and of this Court in Carter-Wallace, Inc. v. Riverton Laboratories, Inc., 304 F.Supp. 357 (S.D.N.Y. 1969), affd., 433 F.2d 1034 (2d Cir. 1970), he was familiar with the general background of the patent in issue. As I view the record the essential facts before him were not in dispute, so that there was no need for him to take oral testimony. SEC v. Frank, 388 F.2d 486, 490 (2d Cir. 1968). There were, on the other hand, sharp issues as to the inferences that could be drawn from the voluminous undisputed facts. Accordingly he heard extensive oral argument which lasted for three days. His lengthy, orally delivered opinion, extending for 167 typewritten pages, including colloquy with counsel, discloses a thorough grasp of the subject matter and a painstaking analysis of the evidence, including each of the new "prior art" references put forth by Davis that had not been cited in the Patent Office's file wrapper and presumably had not been considered by it.

I join the majority in rejecting Carter's contention that preliminary injunctive relief is warranted here on the ground that the validity and enforceability of the patent were adjudicated in *Riverton Laboratories, Inc., supra.* Riverton considered various objections not presented here and did not adjudicate the defenses of obviousness, inequitable dealing with the Patent Office, and patent misuse which have been raised by Davis. To the extent that Judge Dooling's decision relied upon *Riverton* as the basis for granting preliminary relief, it was therefore in error. However, apparently recognizing the weakness of *Riverton* as a sole ground for relief, he devoted little of his opinion to it, in contrast to his extensive consideration of other grounds upheld by him, including the inadequacy of the new defenses raised by Davis, the existence of industry acquiescence, and

the effect of Davis' insolvency. Aware of the heavy burden imposed upon Carter before preliminary relief might issue, he found that it had made a strong showing of validity, stating that "the probability of success on the issue of validity lies heavily with plaintiff" (Opin. pp. 106–07). He further found, after careful consideration of the evidence and Davis' contentions, that there was industry acquiescence in the patent and that "the acquiescence was real" (Opin. pp. 111–15). On the subject of irreparable injury and balancing of hardships, he concluded that damages would not afford Carter adequate relief, in view of Davis' insolvency (Opin, p. 142), and that unless preliminary relief was granted, Carter would suffer loss of business and good will of other customers during the short remaining life of the patent, thus encouraging infringement by others.

Thus Judge Dooling's decision impresses me as being fully supported by valid grounds unconnected with *Riverton*. Since, as the majority points out, we are in as good a position as the district court to determine, in the absence of oral testimony, whether a preliminary injunction should issue on the record before us, Concord Fabrics, Inc. v. Marcus Bros. Textile Corp., 409 F.2d 1315 (2d Cir. 1969) ; Graham v. Jeoffroy Mfg. Co., 253 F.2d 72, 75 (5th Cir. 1958), it would be a meaningless formality to remand the case if the district court's decision is supported by these other grounds. I would affirm on these other grounds.

Since, as I see it, Carter has satisfied the burden imposed by the *Simson Bros.* rule, it is perhaps unnecessary to reconsider that doctrine. However, in view of the great reliance placed upon it by the majority, and possible differences as to its scope, I believe that the time has come for review and clarification of the rule. Judge Friendly, quoting from Judge L. Hand's opinion in Rosenberg v. Groov-Pin Corp., 81 F.2d 46, 47 (2d Cir. 1936), and relying upon the Supreme Court's decision in Graham v. John Deere Co., 383 U.S. 1, 18, 86 S.Ct. 684, 15 L.Ed.

2d 545 (1966), suggests that the doctrine is based upon the inability of the Patent Office's staff of Examiners, swamped with a large number of new applications annually, to give full consideration to the prior art references or to obtain a full statement of all relevant information in an *ex parte* proceeding. I think that this view tends unjustifiably to downgrade the skill, thoroughness and competency of Patent Examiners, each of whom is an expert in the area of his specialty and has available in the Patent Office a library of prior art references dealing with that specialized field. In 1959 this library comprised over 69,000 volumes of scientific and technical books, 59,000 bound volumes of scientific and technological periodicals, and over 8,000,000 copies of foreign patents. L. Amdur, Patent Office Rules and Practice 60–61 (1959). It also overlooks the fact that, unlike most *ex parte* proceedings, where the court accepts only the data furnished to it, the prosecution of a patent application is a lengthy proceeding in which the Patent Examiner acts like an adversary, not merely an administrator, repeatedly rejecting an application until he is satisfied that relevant prior art has been fully disclosed and examined.

> "The grant of a patent culminates an earnest contest, often long drawn-out, between the applicant, represented by his attorney or agent, and the Patent Office, represented by the Examiner, with the public an interested party."
> L. Amdur, *supra*, § 2.2.

Patent Office Rule 104(a) provides.

> "On taking up an application for examination, the examiner shall make a thorough study thereof and shall make a thorough investigation of the available prior art relating to the subjectmatter of the invention sought to be patented."

The Patent Examiner is not limited in his evaluation to the references cited by the patent applicant, L. Amdur, *supra*, § 104; he actively seeks out and may rely upon other references in the field, as occurred at least once in the evaluation

of the application for the patent in suit. See Carter's Supplemental Argument, filed in the Patent Office July 27, 1955. One cannot help wondering why we have a Patent Office if it is to be broadly denigrated.

Having in mind that it will be a rare case where an alleged infringer cannot dredge up some "prior art" references not found in the Patent Office file wrapper, it seems to me that when such an exhaustive procedure results in the issuance of letters patent they should be accorded more weight than a worthless piece of paper. Furthermore, the rationale accepted by the majority for the rule—lack of Patent Office time and staffing to permit exhaustion of the prior art—does not appear to have persuaded Congress, which has expressly provided, 35 U.S.C. § 282, that "A patent shall be presumed valid. The burden of establishing invalidity of a patent shall rest on the party asserting it." But even if we disregard this mandate which was reenacted in 1946 long after the *Simson Bros.* "rule" had been established (as Judge Friendly notes, the rule dates back to 1888, see Dickerson v. De la Vergne Refrigerating Machine Co., 35 Fed. 143, 147–148 (C.C.S.D.N.Y.1888)), we would expect the rule, if we are to be consistent, to apply with equal force upon trial of an infringement suit on the merits. Yet the Supreme Court has firmly held that the alleged infringer "bears a heavy burden of persuasion, and fails unless his evidence has more than a dubious preponderance," Radio Corporation of America v. Radio-Engineering Laboratories, 291 U.S. 1, 8, 54 S.Ct. 752, 755, 78 L.Ed. 1453 (1934). This has been construed in practice to mean that he must prove invalidity by "clear and convincing evidence." Purer & Co. v. Aktiebolagat Addo, 410 F.2d 871 (9th Cir. 1969); Eimco Corp. v. Petersen Filters & Engineering Co., 406 F.2d 431 (10th Cir. 1968); Copease Mfg. Co. v. American Photocopy Equipment Co., 298 F.2d 772 (7th Cir. 1961); Scaramucci v. Dresser Industries, Inc., 427 F.2d 1309 (10th Cir. 1970); General Foods Corp. v. Perk Foods Co., 419 F.2d 944 (7th Cir. 1969); Kiva Corp. v. Baker Oil Tools, Inc., 412 F.2d 546 (5th Cir.), cert. denied, 396 U.S. 927, 90 S.Ct. 262, 24 L.Ed.2d 226 (1969); Carter-Wallace, Inc. v. Riverton Laboratories, Inc., 304 F.Supp. 357, 368 (S.D.N.Y.1969). Although the Supreme Court in *Radio Corporation of America, supra,* was dealing with a case that had been tried on the merits, I have found no suggestion by it, there or elsewhere, that the rule would be different upon an application for preliminary relief. Nor do I see any reason why it should be. The fact that the alleged infringer, upon a trial on the mertis, has had the benefit of pretrial discovery, does not provide a sound basis for shifting the burden. On the contrary, where the alleged infringer, as here, asserts the standard defenses upon an application for temporary relief, he usually has less evidentiary support for those defenses than he might gain as the result of discovery. Surely he should not be permitted to benefit because of his inability to offer supporting proof. Otherwise he gets credit for his ignorance, even though it may later turn out that his defenses are hollow. For these reasons I question the heavy reliance placed on the "rule" in this case and the rationale behind it.

Even accepting the "rule," one assumption underlying it is the theory that since the patentee will have an adequate remedy in damages, 35 U.S.C. § 284, no reason exists for disturbing the status quo pending a decision on the merits. See A. B. Dick Co. v. Barnett, 277 F. 423, 424–425 (2d Cir. 1921). *Simson Bros.* should not be read as abridging the district court's power, in the exercise of its equitable discretion, to consider the infringer's ability to respond in damages, as the lower court did (Opin. pp. 133, 142). See Tropic-Aire, Inc. v. Jumper, 28 F.2d 631, 633 (D.Minn.1928); Norstrom v. Wahl, 27 F.2d 637 (7th Cir. 1928).

The district court's concern over the inadequacy of damages is amply supported by the record before us. The majority points to the fact that Carter's dam-

age claims may receive priority over the claims of other unsecured creditors as administration expenses, but this response is unsatisfactory. The financial statement filed in the bankruptcy proceeding reveals that of Davis' total assets of $629,500, all but $4,500 are encumbered by security interests and thus would probably not be available for the satisfaction even of priority claims.[1] Moreover, Reading Co. v. Brown, 391 U.S. 471, 88 S.Ct. 1759, 20 L.Ed.2d 751 (1968), while placing tort claims in the class of those to be given priority, does not suggest that such claims stand any better than other expenses of administration, such as legal and receivership fees. Davis' counsel (Opin. p. 139) and its President (Weiss Aff. p. 5) have asserted that it will be financially unable to defend this action further if it is not permitted to continue infringing Carter's meprobamate patent.

In a situation in which an infringer's assets are admittedly so scant, it seems clear that if the injunction were denied, Davis' profits from the continuing sale of infringing meprobamate would be the only source to which Carter could look for satisfaction of its damage claim. Yet these profits are what Davis plans to use to finance the trial on the merits. Furthermore, even if the profits were segregated and held as a fund for the satisfaction of later damage claims, they would be insufficient. Davis is buying and selling meprobamate at prices far below those at which Carter is selling under the sanction of its patent monopoly and the Consent Decree entered in 1962 antitrust litigation, see United States v. Carter Products, Inc., 211 F.Supp. 144 (S.D. N.Y.1962). The record reveals that Davis is buying bulk meprobamate at about $1.00 per pound from infringing foreign producers (F.T.C. Statement Before United States Tariff Commission, No. 337–L–41, p. 16) and reselling it, after processing into 400 milligram tablets, at about $5.00 per 1,000 tablets (Weiss Aff. p. 2), or approximately $5.50 per pound (see Weiss Aff. p. 4). It is highly unlikely that whatever profits Davis makes from such transactions (and Davis concedes that the mail order market in which it is operating is highly competitive, Weiss Aff. p. 2, from which one can infer that profit margins are minimal) would be adequate to compensate Carter for the damages suffered by it. If damages are measured as the profit which Carter would have made had Davis purchased meprobamate from it, American Safety Table Co. v. Schreiber, 415 F.2d 373 (2d Cir. 1969), cert. denied, 396 U.S. 1038, 90 S.Ct. 683, 24 L.Ed.2d 682 (1970); Bros Inc. v. W. E. Grace Mfg. Co., 320 F.2d 594 (5th Cir. 1963); Livesay Window Co. v. Livesay Industries, 251 F.2d 469 (5th Cir. 1958); Carter Products, Inc. v. Colgate-Palmolive Co., 214 F.Supp. 383, 393 (D.Md.1963), the damages could be huge, for an enormous proportion of the $24.75 per pound price —perhaps as much as $20.00—would be profit to Carter (F.T.C. Statement, *supra*, p. 16). Moreover, in light of this possibility that damages will be measured by Carter's profit on sales of bulk meprobamate at $24.75 per pound, Davis' offer to pay into escrow 5% of the gross proceeds from its sales of infringing meprobamate at the $5–$7 per pound level, which the majority accepts, strikes me as a rather insubstantial support for the conclusion that Carter will not be irreparably harmed. The insolvency of Davis is thus a compelling reason why *Simson Bros.* should not be invoked in this case.

The majority and both parties recognize that under the "rule" expressed in *Simson Bros.* a preliminary injunction

---

1. This is corroborated by the fact that, although the value of Davis' assets as stated in the balance sheet exceeds the claims of secured creditors ($458,978.93) and tax claims ($59,753.56) by $110,-768.51, Davis and its counsel, who are certainly more familiar with its financial situation than Carter or this court, place no reliance whatsoever on this paper balance. It seems just as likely that litigation expenses in connection with the meprobamate patent would be found to be administrative expenses as would damages for infringement. The claims of unsecured creditors of Davis total $1,692,-391.62.

may issue to restrain infringement where there has been public acquiescence in the patent. See Rosenberg v. Groov-Pin Corp., 81 F.2d 46, 47–48 (2d Cir. 1936). Judge Dooling found such acquiescence on the basis of substantial supporting evidence (Opin. pp. 111–15). The patent issued on November 22, 1955. As the district court recognized, the demonstrated superiority of meprobamate over existing compounds, the existence of a broad market for tranquilizers, and the substantial profits realized by Carter from manufacture, sale and licensing of the product, combined to provide a broad incentive to competitors to challenge the patent and share the market. Yet for the next four years after the patent issued there was no such challenge. This initial period of acquiescence, standing alone, might be sufficient to warrant temporary relief. See Boyce v. Stewart-Warner Speedometer Corp., 220 F. 118 (2d Cir. 1914); Mathieu v. Mitchell Vance Co., 7 F.2d 837 (2d Cir. 1925). It further appears that except for the Government of the United States all other dealers in meprobamate continued for many years to purchase their requirements from Carter or its licensees. Among these was Davis, which purchased its needs solely from Carter from 1963–1968 (Sigerson Aff. p. 14). It was not until 1968, with the patent having only four remaining years of its life, that any substantial infringement began on the part of domestic manufacturers or sellers of meprobamate products.[2]

The majority would discount this impressive acquiescence on two grounds. The first is the fact that the Government has purchased unlicensed meprobamate since 1960 and Carter did not bring suit against it until 1967.[3] The Government, however, occupies a unique position which precludes our attaching the same significance to Carter's failure to sue it for infringement as might be inferred from failure to sue a private infringer. In a suit against a private infringer the patentee may obtain injunctive relief and heavy damages, including profits which the patentee would have made on sales lost as a result of the infringement. The United States, however, is protected against such consequences by Title 28 U.S.C. § 1948, which limits the patentee to a suit in the Court of Claims for recovery of "reasonable and entire compensation." Zimmerman v. United States Government, 422 F.2d 326, 331 (3d Cir. 1970); Broome v. Hardie-Tynes Mfg. Co., 92 F.2d 886 (5th Cir. 1937). The patentee may in no case obtain injunctive relief against the Government's infringement, Crozier v. Fried. Krupp, 224 U.S. 290, 32 S.Ct. 488, 56 L.Ed. 771 (1912), as is sought here against Davis, for the statute recognizes the right of the Government to take the patent under eminent domain subject only to a claim for compensation. Carter has now instituted, and won the first stage of, such a suit. Carter-Wallace, Inc. v. United States, 167 U.S.P.Q. 667 (Ct.Cl.Comm'r 1970). That Carter did not commence its Court of Claims litigation at the very outset of Government infringement is not highly material in light of the fact that it could not halt the infringement, its only remedy being compensation. Since the Government's infringement was going to continue anyway, Carter followed the more sensible course of allowing it to do so up to the point at which its claims would be cut off by the six-year statute

2. Manufacturers in countries not having pharmaceutical patents (such as Italy) are, of course, immune from suit for infringement.

3. The Government was probably prompted to embark upon purchases of unlicensed meprobamate as a result of the wide publicity given by Senator Estes Kefauver's Subcommittee on Antitrust and Monopoly in 1959 to the high profits realized by some pharmaceutical companies from manufacture and sale of certain patented ethical drugs, including tranquilizers. This led many to urge the Government, a buyer of large amounts of such drugs, to realize substantial savings through purchases from manufacturers in Italy, where no patent protection is offered to such pharmaceuticals.

of limitations, 35 U.S.C. § 286, and then commenced its suit.[4] Cf. Irving Air Chute Co. v. United States, 93 F.Supp. 633, 117 Ct.Cl. 799 (1950) (pointing out the difficulty of computing compensation at the outset of a continuing infringement). Furthermore, Carter is entitled to interest on its claims against the Government from the time that they accrued, cf. Farrand Optical Co. v. United States, 325 F.2d 328, 337 (2d Cir. 1963), even though it chose to wait rather than file a series of actions in the Court of Claims. Finally, the measure of damages in the Court of Claims suit would be a reasonable royalty or reasonable compensation. "[A]fter the Act of 1910, even though there was no excess or implied license authorizing the Government to use the patent, its use was not tortious * * *." Irving Air Chute Co. v. United States, *supra*, at 635. The amount awarded Carter as reasonable compensation for the Government's use is likely to be much smaller than the damages awarded for the tortious infringement of a private party like Davis.

For these reasons the infringement by the Government should be disregarded in determining whether there has been public acquiescence. Since the record reveals that the first private infringement, that of Riverton, did not occur until the fall of 1964, the legally significant public acquiescence existed for approximately nine years, more than enough to warrant preliminary injunctive relief.

The second reason for reversing Judge Dooling's finding of acquiescence strikes me as even weaker. It rests upon general statements in the affidavit of George R. Squibb to the effect that anti-competitive tendencies on the part of large drug companies prompted them to acquiesce because of factors other than validity. Dr. Squibb is now the Executive Vice President of Davis, which is financially *in extremis* and urges that it be permitted to infringe in order to survive. Dis-

regarding the influence of this strong interest upon what weight, if any, should be accorded to this aspect of his affidavit, its fatal defect lies in its failure to furnish supporting facts. It is apparent that during the period when he shared the administration of E. R. Squibb & Sons it "missed the boat" in failing to discover or to market meprobamate, which later brought large profits into Carter's coffers. Now we are asked to accept his general statement to the effect that the "apparent" acquiescence is based "partly upon the feeling of the industry" that an attack on the patent might undermine the industry's pricing structure. This kind of proof was hardly worthy of any weight and Judge Dooling wisely did not advert to it in his opinion. The fact remains that the large drug companies, although not subject to favorable licensing agreements and although possessing large resources with which they could have contested the patent vigorously, did not infringe. The smaller companies which are now infringing, like Davis, may well have adopted that course in the hope that their activities would prove too insignificant to warrant litigation, or in the expectation that, with the patent to expire in November 1972, the wheels of justice would turn too slowly to enable Carter effectively to prevent their infringement.

In the absence of any substance to Davis' attack on the long public acquiescence in Carter's meprobamate patent, I would uphold the district court's finding of acquiescence. I also fail to see any legal significance in the fact that Carter failed to institute suit against Davis until October 1969, almost 1½ years after it was notified of Davis' infringement, and did not move for preliminary relief until December 22, 1970. Carter had other suits pending, including its actions against Wolins and Riverton, which constituted adequate notice of its intention to enforce its patent, and Davis

---

4. Carter first learned of the Government infringement in June 1960. In November 1965 it filed administrative claims with the infringing governmental agencies, but these agencies were unable or unauthorized to handle such claims. In September 1967 it commenced an action in the Court of Claims, see 167 U.S.P.Q. 667.

was exposing itself to risk of having to pay substantial damages to Carter. Carter's application for preliminary injunctive relief was made when it appeared that Davis might be unable to respond in damages.

For the foregoing reasons I am persuaded that special circumstances have been shown which exclude this case from the heavy burden normally imposed by the *Simson Bros.* rule. Davis' insolvency demonstrates irreparable injury sufficient to satisfy the requirement of Rule 65, F.R.C.P. For the reasons stated below I am also convinced that Carter has shown a high probability of success upon the merits in proving the validity and enforceability of its meprobamate patent.

At the outset it must be recognized that it is often very difficult to determine whether or not an invention on which a patent was granted was or would have been obvious, 35 U.S.C. § 103. Cf. Graham v. John Deere Co., 383 U.S. 1, 18, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966). Thus far the courts have done very little to pour substantive content into the term, and the standard remains, at least to the uninitiated, a conclusory means of labelling a decision rather than a sure guide to results in new cases.

Among the dangers arising from the absence of any guide as to what is or is not obvious, two deserve attention here— the unreliability of expert testimony and the tendency of things to appear obvious with the aid of "the bright illumination of hindsight," Stamicarbon, N. V. v. Escambia Chemical Corp., 430 F.2d 920, 929 (5th Cir. 1970). Because the notion of obviousness is vague and undefined, expert testimony is likely to be marshalled both pro and con a finding of obviousness. This conflict of experts has occurred in the present case: Davis submitted an expert's affidavit stating that meprobamate was obvious; Carter countered with the affidavit of a distinguished expert categorically denying that the invention was

obvious. Cf. Eagle Iron Works v. McLanahan Corp., 429 F.2d 1375, 1381 n. 13 (3d Cir. 1970). In such a situation the district court is not surprisingly left largely to its own devices, and the suggestion of the majority that additional enlightenment could be had from the live testimony of experts (R. 22) is questionable.

The second danger is the one to which the majority has, in my view, fallen prey. The records are replete with instances where the single step required to make a startling new discovery appears in retrospect to have been so simple and obvious, once one sees the method used, that it is almost unbelievable that no one took that step before it was taken by the person awarded letters patent covering it.[5] Judge Dooling was aware of this tendency for everything to seem obvious in retrospect, and his statement of the problem is worth quoting here:

"The counter-construct that has been erected as a path of invention certainly does not toy with the evidence nor distort it. It's like those color tests we all pass for color-blindness, and if you slip a lens of one or another color over your eye you see a different pattern, and so here in this very large field when the pattern is imposed it's like tracing through a labyrinth: There it is. And it's as plain as the nose on your face.

"You take the pattern away and you're lost again. And one wonders here if you take the pattern that defense counsel have so imaginatively constructed out of real materials away, is the path easy to find? No, I don't see that it is." (Opin. pp. 89–90.)

Moreover, we have been cautioned against this tendency by the Supreme Court, Goodyear Co. v. Ray-O-Vac Co., 321 U.S. 275, 279, 64 S.Ct. 593, 88 L.Ed. 721 (1944), and more recently by various other appellate courts, Stamicarbon, N. V. v. Escambia Chemical Corp., 430

---

5. "Th' invention all admir'd, and each, how hee
   To be th' inventor miss'd; so easie it seem'd,

   Once found, which yet unfound most would have thought impossible."
   Milton, Paradise Lost, Book VI, lines 498–501.

F.2d 920, 929 (5th Cir. 1970); Stevenson v. Diebold, Inc., 422 F.2d 1228, 1232 (9th Cir. 1970).

The dangers inherent in a subjective determination of obviousness point toward the necessity of giving heavy weight to objective factors, such as long-felt but unmet needs, the unsuccessful attempts of others to achieve the results accomplished by the patentee, and the unexpected performance of the patented device or invention. Cf. Graham v. John Deere Co., *supra*, 383 U.S. at 17–18, 86 S.Ct. 684. In the present case it is an inquiry into the third of these factors that persuades me that the invention of meprobamate was not, on the record before us, obvious.

Following time-honored Patent Office "action" procedure, the Patent Examiner rejected the initial patent application covering meprobamate as obvious on the basis of the Baird patent, which taught that glycols (or organic compounds) could be dicarbamated, and Berger I, relating to the so-called "parent propanediols." The Examiner took the view that what the inventors of meprobamate, Berger and Ludwig, had done was to give the Baird treatment to the parent propanediols. This, he stated in his initial office action, did not constitute invention. The granting of the patent, more than five years after the application was filed, was based on the fact that the patent compounds had shown unexpected results and were far more effective and long-lasting than the prior art would have led one to anticipate that they would be. Judge Dooling also found that meprobamate yielded surprising results in light of the teaching of the prior art. (Opin. pp. 106–07.)

Davis now offers several "prior art" references that were not cited in the meprobamate file wrapper [6] and urges that

they were sign-posts indicating the route to meprobamate and making its discovery a matter of experimentation rather than invention. See Indiana General Corp. v. Krystinel Corp., 421 F.2d 1023 (2d Cir.), cert. denied, 398 U.S. 928, 90 S.Ct. 1820, 26 L.Ed.2d 91 (1970). My examination of them in the light of counsel's excellent briefs persuades me, however, that these references pointed away from rather than towards meprobamate, and indicated that further research along the lines revealed would probably be fruitless. More important, none of them indicated that one might, through experimentation, discover the startling and unusual properties later found to be possessed by meprobamate.

Berger II appears to be the prior art reference most heavily relied upon by Davis and by the majority as indicating that discovery of meprobamate was obvious to one skilled in the art. It did not deal with esterification of the propanediol which was the parent of meprobamate, but with esterification of a different propanediol called myanesin (also called mephenesin), which had one terminal hydroxyl rather than the two possessed by meprobamate's parent. Both propanediols, as Berger I had disclosed, possessed anti-convulsant properties, myanesin being the leading tranquilizer prior to the creation of meprobamate. Berger II revealed that esterification of myanesin by substitution of acid succinate for the terminal hydroxyl resulted in the creation of a product, myanesin acid succinate (MAS), which had anti-convulsant properties that were weaker than those of the parent but longer in duration. In short, the new substance sacrificed strength for length.

The discovery of MAS hardly represented a major contribution to the arts and sciences. Nevertheless the major-

---

6. Of course we do not know whether any of them were in fact consulted independently by the Examiner. One reference which we do know was cited by the Examiner against the application, though not cited in the original application (Adkins and Billica, "The Hydrogenation of Esters to Alcohol 25–150°," 70 Journal

of the American Chemical Society 3121–25 (1948), see Carter's Supplemental Argument, *supra*, p. 6, was added to the application by an amendment ordered by the Examiner in an office action on August 3, 1953. It is unlikely that the Examiner would similarly cite references which he had consulted and found irrelevant.

ority conclude that since the esterification of myanesin prolonged the weakened anti-convulsant effect, it might suggest to one skilled in the art the possibility of a dicarbamate esterification of different anti-convulsant propanediols. Even with the aid of 20–20 hindsight this is too huge a leap for me to take. In the first place, since the esterification of myanesin had resulted in a delayed-action, weaker anti-convulsant than the parent, the experiment was in practical terms a dud or dry hole, and the resulting product was of no use to the medical profession or to the public. More important, the theory advanced by Berger II for the delayed and weaker action of MAS was that the esters function like the coating of a pill, providing an inactive shield that is gradually eaten away by body fluids, releasing the parent myanesin. However, the myanesin that was liberated by this breakdown or cleavage of the esters was also undergoing oxidation or degradation, which weakened its effect. Since one skilled in the art would reasonably expect the same process to occur upon esterification of other propanediols, Berger II hardly offered a signpost to some new or improved anti-convulsant.

Meprobamate represented a complete departure from what could reasonably have been expected from the experiments with myanesin. Meprobamate was not only of longer duration than myanesin, it was more effective and stronger. The reason for this was that it breaks down in the body differently than esters of other parent propanediols, such as myanesin. Instead of the esters being eaten away by body fluids, the two carbamate radicals of meprobamate bond with the materials in the parent propanediol and work actively in combination with them. A wholly unexpected result follows. Berger II did not point to this wholly unexpected result. On the contrary, even if a scientist had commenced with dicarbamation of myanesin, he would have found that the experiment "ruined" it, destroying all anti-convulsant activity, and would probably have discontinued

further experimentation. Although the majority point out that this effect was unknown at the time of Berger II, it cannot be disputed that if attempted the result would have occurred. If this constitutes hindsight, it is no different than the hindsight underlying the majority's assumption, based on the remarkable properties found to be possessed by meprobamate *after* it was created, that Berger II suggested such a possibility.

I agree with the lower court's finding that the unique reaction and results that occurred upon dicarbamation of the parent of meprobamate, in contrast to myanesin, constituted a synergistic effect. It would be difficult to think of a clearer example of what the Supreme Court had in mind when it said, in Great Atlantic & Pacific Tea Co. v. Supermarket Equipment Corp., 340 U.S. 147, 152, 71 S.Ct. 127, 130, 95 L.Ed. 162 (1950): "Elements may, of course, especially in chemistry or electronics, take on some new quality or function from being brought into concert * * *." That a synergistic result can be a talisman of non-obviousness is clarified in the Supreme Court's recent opinion, Anderson's-Black Rock, Inc. v. Pavement Salvage Co., 396 U.S. 57, 61, 90 S.Ct. 305, 308, 24 L.Ed.2d 258 (1969): "A combination of elements may result in an effect greater than the sum of the several effects taken separately. No such synergistic result is argued here." Also of relevance is the Supreme Court's opinion in United States v. Adams, 383 U.S. 39, 51, 86 S.Ct. 708, 15 L.Ed.2d 572 (1966), decided on the same day as Graham v. John Deere Co., *supra,* in which the disputed patent was upheld over a claim of obviousness: "As we have seen, the operating characteristics of the Adams battery have been shown to have been unexpected and to have far surpassed then-existing wet batteries."

The Kraft and Bonhoeffer prior art references, rather than leading me to the conclusion that meprobamate was obvious, only enhance my conclusion that Berger and Ludwig did not conduct an obvious experiment. These references

did not deal with propanediols or their dicarbamates at all, but with wholly unrelated compounds. Bonhoeffer, for example, disclosed a monocarbamate of a monoalcohol. In the absence of some relationship to the propanediols, the fact that some other wholly different compounds had soporific, hypnotic or sedative effects was of no significance. Since Yale I and II were not published until after the filing of the application for the meprobamate, they are not prior art. But even if this important barrier is disregarded, they were not concerned, as the majority recognizes, with pharmacological activity. They disclosed only that one could produce a carbamate of a propanediol, which was not a new discovery. Baird, which the Examiner had considered and was the basis of his initial rejection, taught chemists how to convert propanediols to dicarbamates and had even disclosed a homologue of meprobamate, the 1,3 propanediol dicarbamate. The invention here embraced much more, i. e., the discovery not only of a *particular* dicarbamate but that it possessed new, useful and unanticipated properties.

If one accepts my view that the new prior art references fail to raise an issue as to the obviousness of meprobamate, it becomes unnecessary for me to labor the claims of misconduct, which are based mainly upon failure to disclose the aforementioned prior art. I agree with Judge Dooling's finding that "there is not here anything from which one can infer an intention to deceive the Patent Examiner" (Opin. p. 85), and that Berger "was not fraudulent, not deceptive" (Opin. p. 86). Berger's comparison in his July, 1952, affidavit between the anti-convulsant properties of meprobamate and those of myanesin does not strike me as unfair or dishonest because of its failure to disclose that the diacetate of myanesin had duration comparable to meprobamate. In my view this criticism once again makes the mistake of divorcing length from strength. It was the *combination* of these qualities

that rendered meprobamate patentable. The diacetate, because of its weakness, was not worthy of consideration as a substitute for myanesin, the leading anticonvulsant with which Berger understandably made his comparison. Meprobamate, on the other hand, was obviously superior to both.

Since I would affirm the district court's decision, some reference should be made to the antitrust misuse defenses which the majority, because it reverses, did not reach. These defenses strike me as not having any merit. Assuming *arguendo* that the post-sale restrictions in Carter's 1956 agreement with Merck and its 1957 and 1959 agreements with Cyanamid, under which it sold meprobamate for use *only* in particular combination drugs, violated the antitrust laws when executed, which is a doubtful proposition at best, any illegality was eliminated by the 1962 Consent Decree. The latter obligated Carter to sell bulk meprobamate to all qualified pharmaceutical houses, including Cyanamid and Merck, at the maximum non-discriminatory price of $20 per pound (plus increases based on the Consumer Price Index) and the Cyanamid and Merck agreements were amended accordingly to *permit* rather than *require* that meprobamate be used in the combination drugs. Thereafter Cyanamid and Merck, like some 100 other pharmaceutical houses which purchased bulk meprobamate from Carter (Sigerson Aff. p. 5), were free to buy bulk meprobamate and resell it without restraint. The earlier agreements, as thus amended, were continued in effect only to permit Carter to continue charging those companies the lower prices theretofore specified in the agreements for meprobamate used in the combination drugs. There is no suggestion that others want the lower prices on the same basis for use in combination drugs, or that others would be refused such terms. Thus any antitrust misuse has long since been purged or dissipated.

For the foregoing reasons I would affirm.